Nott, J.,
opinion:
The case of Reeside is brought to recover the sum of $20,376 62, being the amount of certain commissions allowed to him as inspector and purchasing agent of the government under an appointment of Major General Fremont; and the cases of Higdon,Morgan, and Geffroy are brought to recover certain balances alleged to be dueunder-the contracts made with them by Reeside as the purchasing agent of the government. These cases have been under advisement for an unprecedented length of time, partly on account of the great magnitude of the questions and interests involved, and partly because it was understood that there were a number of other cases which would present the same questions. The court desired that such parties should be heard and that the matters to be determined should be presented, if possible, in every form before a final decision should be rendered. Jt is to be regretted that, notwithstanding the prolonged consideration given to *20 these cases, we have arrived at different conclusions as regards some of the questions involved; hut we have, nevertheless, been able to reach a common result, which I now proceed to state.
On the 25th July, 1861, Major General Fremont arrived at St. Louis and assumed command of the “Western Department.” He was an officer but recently commissioned in the regular army, yet well known to the government and to the people of the United States by an experience replete with incidents of extraordinary energy and of extraordinary daring. Beside the personal adventures of his wondrously romantic life, there was then fresh in the minds of all men the history of his organizing, without commissioir or authority, a miniature army and government, remote from sympathy and support, and seizing for the United, States against greatly superior power and numbers, the Mexican province of California. He had also resigned a high diplomatic position to assume such responsibilities as the government might choose to assign to him; and the government, upon his arrival, had assigned to him the military command of a department which included the three great rivers of the United States, and extended from the northern to the southern boundaries of the country.
The department'needed an extraordinary commander. The rebellion had been gathering strength for three months, and the first great reverse had just been suffered by the national arms. Within the chief city of the department an outbreak was constantly apprehended. Its wealthy and influential inhabitants, for the most part, sympathized with the enemy. The flower of its young men had already joined the forces that were making war upon their country. The native-born and adopted citizens had taken opposite sides, and stood arrayed class against class. Different hostile camps had been established by the two parties, and the threatened anarchy and civil strife had been averted by a blow struck with decisive energy by the loyal side, but which the other denounced as a bloody and needless massacre. The arms and munitions of the United States had been saved by hurrying them from the arsenal by night, and ingloriously carrying them within the protection of the loyal States. Throughout the department everything was unorganized or incomplete. The western country had suffered from bad harvests and disastrous enterprises, and was poor and illy fitted to prepare for war. No officer of high rank or approved experience had been sent by the government to direct affairs, save one, and his fidelity had been suspected. The rapidly increasing forces of the enemy were gathering within Missouri and threatening speedily to fall upon St. Louis, which was the' military key of the department. The rivers *21 and railways still remained in the possession of the government, but their retention was not due to a superior force; for, against great odds, they had been saved only by the military genius of a captain in the second regular infantry, the brief period of whose glory is clouded alone by the national bereavement of his heroic death.
Of all the officers from whom the government might have selected a commander, there certainly was not one more likely to disregard the means, provided he could thereby attain to great public ends, than General Frémont. His whole life was a pledge of his readiness to assume great responsibilities. And at this time the government required of him much more than the services of a military commander. It required of him not only that he should command, but that he should create. His citizen troops were unarmed, unclothed, undisciplined, constantly marched and countermarched, and from them he was required to organize an army. The department was bisected by the greatest of navigable rivers, and for it he was required to construct a navy. The governor of Missouri had given the authority of his office to the rebellion, and for the State the general was required to reorganize a civil government. For all of these duties General Fremont received none of the ordinary machinery by which such duties are usually performed. He was obliged to provide his material as well as to organize his army and build liis navy. And the government gave to him the most absolute and uncontrolled power which it could give, for it fettered him with no instructions. Under such circumstances, knowing the events that wore to be controlled, and the man sent to control them, silence was more expressive than language. No case could be framed that would present more strongly the legal right of a military officer to exercise the power which it is claimed General Frémont lawfully exercised. The remark said to have been made by President Lincoln, that he had given to General Frémont more ' power than he possessed himself, though a paradox, was illustrative of the truth.
General Frémont exercised these powers. The evidence in these cases shows that he exorcised them with all the zeal and energy that might have been anticipated or apprehended. Among them was the power of making- contracts without regard to the conditions and methods prescribed by the statutes of the United States, and these contracts, made for the public defence, it is now the unpleasant task of this court to pronounce void.
The five cases now before us differ somewhat in detail, but we are met at the threshold of each by this preliminary and important question : Is an express contract made by a commanding general in the *22 midst of war, and when the requirements of civil law cannot be complied with, valid by virtue of public necessity or martial law, if it bo in effect forbidden by tbe law of the land ? Since these cases were submitted, others also have been brought before the court, arising out of the acts of other generals, and involving the same question of military power — a question as difficult and delicate as a court of justice can be called upon to decide.
The varied and able arguments which have been addressed to the court on-this question may be reduced to two embarrassing propositions. First, it may be said that without the recognition of this “ war power ” (as it was termed upon the argument) ¡the nation may be left defenceless in time of great peril — in times of absolute necessity, when civil gives place to martial law, and when the life of the republic depends on the ability of the government to use all the resources which the country possesses. Second, it may be also said that the existence of such a power as a matter of legal right would enable a military officer to override all laws and restrictions, and under the plea of military necessity encumber the republic with a debt from which it can never legally escape. Or (to apply these principles to the cases before us) it maybe urged on the one hand, that without the exercise of this most necessary power General Fremont would have had an army without arms; and replied upon the other hand, that if such a power does legally exist, and which the law cannot restrain, then General Fremont might have contracted for entire navies, and in the arbitrary exercise of his discretion might have placed a burden of debt upon the nation from which it could never lawfully be free.
The ordinary resource in difficult cases — authorities—here gives to us no aid. The great elementary writers, Grotius and Vattel, with their followers, have written for absolute sovereignties, and not for a constitutional and limited government. Their words, moreover, are addressed rather to the conscience of the ruler than, to the understanding of the judge. Their conclusions set forth principles for the guidance of those possessed of discretionary power, rather than rules which must be followed by those who have no discretionary power, and whose duty it is simply to search out and declare the law.
Beside these authorities, those great fountains of legal learning, the reports of adjudged cases are equally unavailing. Neither the courts of the common law, nor the numerous constitutional decisions that embody the reasoning of our greatest jurists, have determined the principle now involved. I have looked with care through the authorities cited by the counsel who have addressed the court, and I find nothing *23 which in my opinion decides or elucidates this perplexing question. It is indeed a new question, now to be determined for the first time under the laws and Constitution of the United States.
The doubts which beset this question grow out of a non-appreciation of the great and terrible nature and effects of war. A remote war prosecuted against a distant enemy, as our naval war with Algiers, or carried on in a corner of the country, as the Indian war in Florida, prosecuted through the agency of a reg-ular army or navy, and estimated by the dollars and cents which it costs, does not bring the question home to the nation, nor affect the civil functions of the government, nor produce that upheaval of all settled and established domestic affairB which comes within what we may term the state of war.
It appears to me useless to speak of law — meaning thereby the laws of peace — when this state of war actually exists. Statutes and decisions have then no authority, and war changes the views as the acts of the body politic. To take the life of another is a great and heinous crime at the civil law, punishable by a disgraceful death. In war, it changes to a noble and commendable act. He who labors for the welfare of mankind in peace, increasing their comforts and prolonging their lives, is praised as a public benefactor. In war, the one who stands not upon the destruction of human life, whether of friends or foes, is deemed worthy of gratitude, and the highest honor belongs generally to him who destroys the greatest number. At the common law, one who was guilty of self-destruction was deemed guilty of the foulest of crimes; a stake was driven through his body; it was buried where four roads met, and his children' forfeited their inheritance. In war, self-destruction may be the highest or fairest of virtues. Under no system of municipal law can a man break into my enclosure, or trespass upon my grounds, or cut down my trees, or carry away my crops; he cannot enter my dwelling, nor compel me to go with him against my will, nor evict me from my estate; yet all of these things may be done in war.
A vague idea has been attached to the Constitution as though it could rise superior to other laws and control the events of war. Such questions have been'argued gravely before courts; as, whether there could be a war, except in the form and manner which the Constitution prescribes. It was said that inasmuch as the President could not declare war, he could not accept it, and hence that under the Constitution there could be no war until Congress should declare or accept it. A sufficient answer to these sophisms is^to say that the existence of war is not a question of theory or of law, but of fact. The Consti *24 tution is self-declared to be but law. It is true that it is the supreme law of the land, but it is still law. It provides a frame-work of government, and contains certain civil safeguards, and there it stops. It does not affect to provide for the state of war, (save that it designates the commander-in-ehiof of the army and navy, and enjoins that soldiers shall not be quartered in the homes of citizens, “but in a manner to be prescribed by law;”) nor does it attempt to limit and control events which are governed by the law of force alone.
To understand this it is but necessary to apply the Constitution to the state of war. The Constitution guarantees to every citizen “the free exercise of religionbut the state of war prevails, and the free exercise of religion is gone. The Constitution, in the most solemn manner, declares that “ the right of the people to keep and bear arms shall not be infringed;” but the state of war comes, and the right to keep and bear arms is gone. Under the Constitution the people may peaceably assemble and petition the government for a redress of grievances; but, under the rule of war, a commanding officer may disperse their assemblies and forbid their petitions. A citizen of the United States “ shall enjoy the right to a speedy and public trial by an impartial jury;” but in the state of war the form and manner of his trial depend on the orders of him who commands. A citizen cannot be compelled to travel against his will; but war comes and carries him from one extreme of the country to another. A citizen may be entitled to the exercise of the elective franchise; but in war another may prohibit him from crossing the road to deposit his ballot. Slavery and involuntary servitude are forever prohibited by the Constitution; yet in war a military officer may impress the citizen, and place him in the trenches of his fort, and compel him to labor like a slave. Before the Constitution all men are equal; but in this state of war one man may command another; he may force him to yield him respect, to obey his orders, to travel where he wishes, to halt where he directs. This state of war, therefore, is repugnant to every principle of constitutional law, and its necessities or powers are not to be lightly invoked nor needlessly continued in a state of peace.
This surrender of its power and functions the law recognizes and regulates by an expressive maxim — Inter arma silent leges. The maxim expresses with wonderful precision the exact limits to which the state of war must be confined. It will be observed that the law does not become silent in the neighborhood of martial events, but in their midst; and even amid such events the law is not abrogated or *25 repealed, or even suspended, but simply refrains from speaking, and is, of its own accord, silent and unenforced.*
When tlie state of war lias passed, the law resumes its sway. It does so instantly and of its own vigor. Yet it recognizes tbe changed circumstances which, may have been recast in this crucible of war. Without the interposition of statutes or treaties it perceives that what was lawful has become unlawful, and what was unlawful has become lawful. It can perceive that boundaries have been changed, and that territory which was a part of the republic has ceased to be such, or that what was foreign soil has become the property of the nation. It can recognize the fact that citizens have become aliens, or aliens citizens. Its tribunals reverse the ordinary practice and receive instruction from the political branches of the government. Thus, with regard to foreign governments, they recognize only those which the political power of the nation recognizes. (4 Cranch, 272.) Thus, with regard to our internal polity, the Supreme Court, through its late Chief Justiee, has gone so far as to be bound by the decision of *26 another branch of the government (Congress) when the question before the court involved the constitutional existence of a State government. (Luther v. Borden, 7 How., 42.) We may conclude, therefore, that the law always recognizes facts as they exist after the state of war has passed, and that it never attempts to undo or change what war has done.
But the argument demands more than this, and requires that this court should complete and carry out what the military power • has left undone. It would seem a sufficient answer to the request to say that a court of law can never carry out or enforce that which the law prohibits. Acts which can be defended only by showing that at the time the civil law of necessity was silent, and did not then absolutely prohibit them, cannot receive the aid of the civil law when it again speaks, and speaks to forbid. War, so far as jurisprudence is concerned, is a return of society to its rude, primeval state, where life and liberty and property have no safeguards, and all wrongful acts may be justified by the will of the commanding general. Within such a chaotic state there are no settled principles or rules which can deserve the name of law, or which can extend beyond that state and give validity to prohibited acts, or be obligatory upon civil courts. What has actually been done by war the civil courts accept as a fact accomplished, beyond human control, and decided by what is justly termed the supreme arbiter of nations; but those illegal acts which the war leaves unper-fected must of necessity fall, unless rendered legal by the legislature.
As I have already said, the authorities upon this question were not intended so much for the guidance of civil courts as addressed to the conscience of sovereigns. The same might be said of the able arguments addressed to us by the learned counsel who have presented these and similar cases. But the moral obligations requiring that legal effect should be given to these contracts, I think must fall upon the legislative rather than upon the judicial branch of the government. The safety of the state may become the supreme law, but it is a supreme law that lasts no longer than the circumstances which created it. When they have passed away, it also has passed away; and if, while it existed, a military officer should have entered into agreements which the honor of the nation requires should receive a continuing legal effect, the presumption is that the legislative department of the nation will give to them that legal sanction which will enable its courts of law, if necessary, to enforce them. At all events, the power -and responsibility of ■ approving or disapproving rest with the legislature and not with the judiciary.
*27 If these principles be brought down to the ease of contracts made by a general in the field, they will be applicable respectively to contracts executed and executory, or, to speak with more precision, to contracts performed and contracts left unperformed. As to the former, courts of law will not suffer them to be disturbed. The government cannot treat them as illegal and recover back the purchase money; the contractor cannot treat them as nullities and recover a greater price than they provided. But as regards the latter class, courts of law cannot aid them, unless they are authorized by law. If the law should prohibit them, then the only redress which the suffering parties may invoke is that which the law-making power may give. If the legislature refuses this, then they are without redress. We therefore think that the cases now before us must be determined by the law of the land as established and declared in the statutes of Congress; and that where they conflict with the law of the land they cannot be aided or legalized by the extraordinary circumstances attending their inception, or by that supreme necessity which morally might justify them, and which, upon the argument, was spoken of as the “war power” of the government.
When we come to examine these cases upon their legal merits we find that three objections are presented by the defendants against a recovery. These we will examine separately.
I. It is objected that these contracts were not preceded by advertisement. The act of 2d March, 18G1, (12 Stat. Lp. 220,) directs that “ all * * contracts for supplies or services * * * when the public exigencies do not require the immediate delivery of the article or performance of the service shall be made by advertising. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract at the places and in the manner in which such articles are usually bought and sold, or such services engaged between individuals.” Without now holding that this statute is merely directory, and that where a contract is in good faith made by a general intrusted with an important command, he will be deemed intrusted with the power of determining the question of exigency, it is enough to say that here was an exigency greater than was ever contemplated by the fr.amers of the law, and that the object of the contracts was to procure an immediate delivery of the articles purchased. We therefore dismiss this objection as unworthy of further consideration.
II. The second objection which these cases disclose arises from the following facts :
*28 On the 11th August, 1861, General Fremont appointed John E. Eee-side as inspectouof horses for the western department. The appointment in express terms made him responsible “that every animal passed” by him should be “ equal in value to the price paid,” and it allowed to him a percentage of two and a half per cent. On the previous day an order had been given to him which said : “ You will proceed, without delay, to Cincinnati and purchase, cause to be purchased, or inspect, when purchased by other contractors, two thousand horses for the service of the army. You will not pay, on an average, over $130 each at such places as you may name as places of inspection.”
The agent seems to have been well chosen, for the evidence indicates that he possessed wealth, reputation, great energy, and unusual experience, and that he saved to the government more than the amount of his commissions in railroad freight alone. It also indicates that the commission of two and a half per cent, to be allowed to him was just and reasonable for the services to be rendered and the responsibility to be assumed.
Under these two orders, and instructions subsequently given, Mr. Eeeside purchased, between the 11th August and 7th December, 1861, 5,027 horses, besides other property.
The amount of commissions claimed by him on account of inspections is nineteen thousand seven hundred and ninety-one dollars and twelve cents, ($19,791 12,) and for cash disbursements the sum of five hundred and eighty-five dollars and fifty cents, ($585 50,) making the whole amount claimed t wenty thousand three hundred and seventy-six dollars and sixty-two cents, ($20,376 62.)
His travelling expenses, the cost of advertising, and other items incidental to his duties as purchasing agent, were borne by himself.
By virtue of this authority, Mr. Reeside entered into executory contracts on behalf of the government with various persons, and among others with the claimants Higdon, Morgan, and Gefiroy. By the terms of these agreements they were to furnish horses to the government and the government was to pay for them certain specified prices. Pursuant to the agreements, these horses were duly furnished, and were turned over to the United States quartermaster, who, recognizing the orders of General Fremont and the contracts of Reeside, gave to the contractors the usual vouchers for the agreed price. This price was higher than that paid for ordinary cavalry or artillery horses, and the horses furnished were of a superior quality; but the price paid did not exceed the price authorized by General Fremont, viz : an average of $130 per horse.
*29 It will be perceived from this statement that the position and powers of Mr. Reeside were peculiar. On the one hand, he acted as a purchasing agent with power sufficient, it is claimed, to bind the government by express contracts. On the other hand, he was not intrusted with public funds, nor did he receive and account for the property purchased, nor did he give a bond for the faithful performance of his duties, nor did he take the oath prescribed for quartermasters by law, nor did he assume to act as a quartermaster of the United States. On the contrary, after the horses were purchased and branded by Mr. Ree-side, they were forwarded to the regular quartermasters of the department, who gave vouchers for them to the contractors, and who received and accounted for them as for other property purchased by him for the use of the government. Yet the quartermaster did not control Mr. Reeside nor exercise any discretion with regard to his purchases, but, sinking into a strictly ministerial officer, gave his official vouchers as a necessary step toward completing the business really transacted by the purchasing agent.
Such being the facts, as we understand them, this legal question arises: Who are the agents of the government with power to bind the United States by express contracts ?
This question is one of the most important and difficult that has ever been before the court, relating not only to the number of suits now awaiting our decision, but to numberless other suits, which, so long as this court may exist, will arise from every department of the government, and which, if our conclusion here is sustained, must to all intents and purposes be determined now.
Among private persons and bodies corporate, the relations of agency may be easily established. An express authority need not be shown; and where no agency in fact existed a subsequent ratification will relate back and legalize that which had no legal inception. So also where an agent has no authority to delegate his powers to another, the recognition of the. sub-agent will establish a second agency, and constitute him the agent of the principal. It is the settled rule of this court, aud the principle upon which it was established, to administer the same law between the government and a claimant which is administered between ordinary suitors. But the difficulty in these cases is to determine lohcit is the government. The President and his cabinet are frequently spoken of as the government, yet they are merely high officers possessing delegated and restricted powers. But it is not necessary to hold the law-making power alone to be the government, for in many instances, as, for example, in our relations with foreign powers, *30 the President, or the President and Senate are to all intents and purposes the government. After prolonged consideration I have come to the conclusion that when the object and the purpose of the agency is to create an indebtedness on the part of the United States, then that such an agency can only be authorized by that branch of , the government whose function it is to pledge the public credit, and whose duty it will be to provide for this as for all other publie indebtedness. I am, therefore, prepared to say that he who deals with one professing to be a financial agent of the United States, must look to the law for the existence and limits of the agency, and that there can be no agents possessed of power to bind the government by express contracts except such as are expressly authorized by law.
But by this expression “expressly authorized by law,” it is not intended that the agency must be expressly named in a statute. When Congress is recognized as the principal, the analogies of the law of agency can be preserved in these and all similar cases. The agency may be expressly named or necessarily implied. So, too, acts not binding on the government may be made valid by legislative ratification; and those who were not agents may become such by the recognition of Congress. It is merely intended that an authority to bind the government by contract can only be imputed to one whose power proceeds directly or indirectly from the legislature, and whose authority is created and defined by express law, or by necessary implication.
With regard to the cases now to be decided, we do not find that there is any statute prohibiting a general in time of war from appointing purchasing agents like Mr. Roeside. But we do not find that there is any statute which expressly or by implication confers any such power, or authorizes any such appointment. Further than this, the acts of Congress have provided with particularity and care for the purchase of military supplies, and have organized a complete corps of officers originally called by the expressive name of “ the purchasing department,” (Act 24th April, 1816, 3 Stat. L., p. 297,) who are the military purchasing agent3 of the United States. It was formerly the duty of the chief of these officers, (the Commissary General'of purchases,) “under the direction and supervision of the Secretary of War, to conduct the procuring and providing of all articles of supply requisite for the military service of the United States;” and it was made the duty of his assistants, (the deputy commissaries,) “when directed thereto, either by the Secretary of War, the Commissary General of purchases, or, in cases of necessity, by the commanding general, Quar • termas ter General, or deputy quartermasters, to purchase all such of the *31 aforesaid articles as may be requisite for the military service of the United States.” (Act March 28,1812, 2 Stat. L., p. 696.) By a subsequent statute, (A.ct August 23, 1842, 5 Stat. L., p. 512,) the purchasing department was abolished, but “ the duties thereof ” were required to be “ performed by the officers of the quartermaster’s department.” Thus it is seen that the only military purchasing agents contemplated by the statutes are specifically named by Congress, and are moreover selected by the President, confirmed by the Senate, and before entering into their office, take an official oath, and give security for the faithful performance of their duties. It also appears that not only are all of the articles requisite for the military service of the United States to be purchased by these officers, but that the statute also contemplates “cases of necessity,” and provides that then the purchases shall be made by the same officers, under the direction of the commanding general, not requiring the sanction of the Secretary of War. If General Fremont had given the order to a quartermaster of the United States, or if Mr. Reeside had been made the agent of the quartermaster, and his acts been made subject to the quartermaster’s approval, the legal aspect of the case would have been different, though the practical result might have been the same. As it is, he was not made subordinate to the quartermaster of the department, but the quartermaster was made subordinate to him. Whether the government would havé been better served by its officers than by a zealous and experienced agent like Mr. Keeside, is not for us to say. It is our simple duty to administer the law as we understand it. After a full consideration of the point, a majority of the court are of the opinion that among General Frémont and Mr. Reeside aud the quartermaster there was such a mingled and divided responsibility as was never contemplated by the statutes, and that the chief discretion was exercised by one to whom the law had never committed it. We, therefore, are compelled to hold that the express contract made by General Fremont with Mr. Reeside, whereby the latter was allowed a commission of 2'¿- por cent., as a purchasing agent of the government, and the express contracts made by Mr. Reeside under this authority with the claimants, Higden, Morgan, and Geffroy, were not authorized by law, and imposed no legal obligation upon the government.
But it is desirable that this decision should not be carried further than the court intend, nor applied to facts differing from those to which we apply it. We do not decide that if General Fremont had made these contracts himself, and in his own name, he might not have done himself what he might have compelled a subordinate to do; neither *32 do we decide that if Mr. Reeside had been appointed by the President or Secretary of War, who appoint quartermasters, his acts would not have bound the United States; nor do we decide that an officer detailed to act as quartermaster is not a quartermaster de facto, and authorized to enter into contracts which will be obligatory upon the government; we only decide that a private person who is neither military nor civil officer of the government, and who is not a quartermaster of the United States, cither dejure or de facto, and whose agency has neither been created nor recognized by Congress, has no authority to bind the United States by express contracts.
But the cases do not stop at this point. These parties have voluntarily placed tlieir property at the disposal of the government, and they have done so on the faith of a contract sanctioned by an officer of the highest military rank, and intrusted with the highest military responsibility. They have, moreover, given evidence by which the court can estimate the value of the property sold; and they have shown that this property was .used in the service, taking the place of other property which would otherwise have been purchased, and being provided for by ample appropriations previously made by Congress. It would, therefore, be an ungracious answer were the law to deny them all relief, and an unjust and harsh conclusion to say that they are entitled to no redress when the government has accepted their property and received a benefit thereby. The maxim which G-rotius applies to the compacts of generals in war seems not inapplicable here: “ Whatever brings profit is binding;” as, also, is his comment thereon: “ We must condemn them of injustice who refuse to perform the agreement, and yet still retain that which they could never have had without the agreement.”
But this acceptance of the property by the government is not to be understood as resting upon the ground of its acceptance by the govern-ernmcnt quartermaster. An officer of the government has no power to bind the government by the acceptance of property where its purchase would be illegal. On the contrary, such property could not be deemed to be received to the use of the United States. In the cases before us I look beyond the naked act of the quartermaster, and place the acceptance of the government upon the following grounds: First, upon the fact that the object of the sale was lawful and proper; that Congress had authorized such purchases by general appropriations, and that they would have been valid if made by the proper agents. Second, upon the fact that though property was purchased by an unauthorized person, not the agent of the government, yet still that it *33 was regularly and properly delivered to tie officers charged with the receipt of such property, and was duly accounted for by them as property of the United States, their accounts being accepted and acquiesced in by both the administrative and legislative branches of the government. Third, upon the fact that this property entered into the actual use of the government, that an actual benefit was derived from it, and that if it had not been thus furnished by the claimants, other property of a like nature must have been purchased by the United States. All of these facts may not be necessary to constitute a legal and binding acceptance on the part of the government; but existing, I deem them to be conclusive,
A distinction, nevertheless, is to be made between services and things which are in themselves legal, and those which are illegal. The services of Mr. Reeside, even though they were wholly beneficial, were partly lawful and partly unlawful. Iiis claim for commissions rests upon the fact that he was required to assume a responsibility as the purchasing agent of the government. This responsibility the law vests in the officers of the government; they could not divest themselves of it, nor contract with Mr. Reeside to assume it. Much less could they compel the government to assume the expense and burden of his undertaking to bear that which they were required by law to bear. At the same time, his services as inspector and forwarding agent were legal; a benefit was derived from them; they were accepted by the government, and for them the government is liable.
I have arrived at the general conclusion which governs these cases, after careful reflection, endeavoring to look beyond them, and to rest the decision on a broad and enduring principle, which will be applicable to all other cases, and will shield the government from the enlarging exercise of a dangerous power, and do substantial justice to every person who may voluntarily part with property upon the faith of a supposed agreement, and for the benefit of the United States. It is not perceived that beyond the hardship of an exceptional case, any injury can be done under the rule which this case suggests. That rule is this : The power to bind the government by contract can only be exercised by those officers whom Congress have constituted its agents, either by the express words of a statute or by necessary legal implication; yet, where a person has parted with his property for a lawful purpose, which has been received and used by the proper agents of the government in the necessary service of the government, there the owner may recover for its actual value.
*34 III. The third and last objection, which is applicable to only some of these cases, we will now consider.
In October, 1861, payments were suspended by order of the War Department on all contracts made under or by the authority of General Frémont. The reason of this suspension was that frauds were supposed to have been practiced on the government in some instances, and in others, that-the contracts were irregular and illegal. On the 25th October, 1861, a commission, consisting of Messrs. Davis, Holt, and Campbell, was appointed by the Secretary of War. The order for their appointment states that they were appointed “to examino and report upon all unsettled claims.” And the former Secretary of War has testified in another case that “ It was an exparte commission of inquiry, and they were to report to the War Department, subject to its revision. The commission had no final powers.” The War Department also from time to time gave to the commission specific instructions respecting its proceedings, which were complied with. The commission was therefore ex parte in its nature, and was not intended as an arbitration, nor supposed to he possessed of judicial or quasi judicial functions. Public notice was given that all the suspended claims might ho submitted to the commission before a specified day, arid, if allowed, would be paid. The department did not oblige the claimants to submit their claims, but as this was tlie only remedy afforded, and no claims save those submitted were paid, it was in effect a practical compulsion. In some instances the papers and vouchers of the claimants were sent to tlie commissioners by tlie quartermaster to whom they had been presented for payment; in others, the parties themselves submitted them. When the commissioners liad reached a conclusion, they required the party to sign a release, not under seal, in the following form:
“ The undersigned acknowledge to have received the vouchers referred to and described below, which, when paid, will be in full of all demands against the United States on account of the respective claims set opposite to their names :
Receipt. $00, 030 Samuel J. Morgan.* 302 Name of claimant. Nature of Samuel J. Morgan.. Horses. - - I! $67,8G0 Amount al-Sdiedulc.
At the time o£ signing the release, some of the parties protested, averring that they did so under compulsion, and in order to procure their *35 papers, otherwise withheld by the commission. Others of the parties signed without making any protest, or raising any objection; all subsequently accepted the money awarded by the commission, and gave therefor the ordinary voucher, without objection or protest. •
We think it evident that the proceedings of the commission did not constitute an arbitrament. We think it also evident that the stipulation exacted by the commissioners, inasmuch as it neither expressed a consideration nor was under seal, cannot be deemed a valid release of an existing indebtedness. We think it also evident that if the express contracts were valid, this receipt or agreement could not be an accord in satisfaction of a disputed or doubtful claim. But when the illegality of the express contracts is established, then it becomes a question whether the offer of a certain amount by the one party, upon a claim whose validity he correctly denies, on the express condition that the payment shall be taken in full satisfaction of the protended indebtedness, followed by the signing of a stipulation to that effect by the other party, and his acceptance of the amount offered, does not conclude him from ever disturbing the case thus adjusted, and from recovering the balance which he expressly relinquished?
If this were a suit between ordinary persons, we might say undoubtedly that the plaintiff was thus concluded. And if the analogy between these suits and an ordinary action were complete, we also might say that the claimants were concluded. But the analogy is defective in this essential — that if the claim had been against an ordinary person the plaintiff might have enforced it by a legal remedy, and hence that his settlement or compromise of what was doubtful or disputable was voluntary; while, here, the claimants had at that time no legal redress, and their refraining to accept what the commission offered would have been a sacrifice of all that was due to them. In the ordinary case the defendant says, you may accept what I offer you, or you may pursue your legal remedy; in this case the government said, you may accept what is offered, or you may go without anything. The controlling element of voluntary compromise was tliere--fore wanting; or, as was said by-Mr. Justice Story, in the case of The United States v. Dickson, 15 Peters, p. 161: “The construction given to the laws by any department of the executive government is necessarily ex parte, without the benefit .of an opposing argument, in a suit where the very matter is in controversy; and when the construction is once given, there is no opportunity to question, or revise it by those who are most interested in it, as officers deriving their salary and . emoluments therefrom, for they cannot bring the case to the test of a *36 judicial decision. It is only when they are sued by the government for some supposed default or balance, that they can assert their rights. Their acquiescence, therefore, is almost from a moral necessity, when there is no choice hut obedience, as a matter of policy or duty.”
I say that “at that time” the claimants had no legal redress, for at that time the Court of Claims as at present constituted did not exist. The court, down to its re-creation, in 1863, sat only to determine questions of law and fact, which, when determined, were to be submitted to the discretion of Congress. To procure the passage of a claim which had received the sanction of the court was found to be as difficult as to pass one which had never been submitted to it for adjudication. 'It was also found that Congress disregarded or rejected more of the judgments of the court than they enforced. In practical effect, therefore, as in legal theory, the court possessed no adequate remedy, and gave no judicial redress.
As at present constituted, the Court of Claims has all the power requisite for giving to the creditor upon contract against the United States effective and complete redress. It has power to summon witnesses, to enforce their attendance, to adjudicate “ set-offs and counterclaims,” to render final judgment against the government or against tiie claimant. These “final judgments,” if in favor of the claimant, “shall be paid out of any general appropriation made by law for the payment and satisfaction of private claims.” (Act March 3, 1863, 12 Stat. L., p. 765.) The law and the ncmedy, therefore, are essentially different from the law and remedy existing at the time the claimants accepted the award of the military commission. The element of voluntary concession and compromise might now well exist in a similar transaction, and we should not in any sense be able to say that the party would have sacrificed everything if he had not accepted what the government saw fit to give him. Under the existing law we miglif well hold, upon the facts in these cases, that the claimants had a perfect legal option, and that they elected to compromise and settle their respective demands.
In the case of Reeside v. The United States, the amount claimed is $16,168 97, for commissions upon 5,027 horses, costing in the aggregate $646,760; and the further sum of $3,622 15, commissions upon military equipments and other property purchased by the claimant under the directions of the quartermaster, and costing the sum of $144,488 10; and for the further sum of $585 50, being money paid to the use of the United States, in furnishing necessary subsistence to the horses after purchase, &c., &c.; all of which amount in the *37 aggregate to tbe sum of $20,376 62. This claim we reduce to $4,000. The evidence shows that Mr. Reeside was in the service of the government for a period of four months, and that he bore his expenses — travelling, advertising, &c. — of which no account was kept, he assuming that the contract allowing him commissions was valid. We find from the evidence that the sum of $4,000 is a reasonable compensation for these services andexpenses; and of the money paid to the use of the government, that the sum of $161 is established by the evidence, amounting in the • aggregate to $4,161, for which judgment will be rendered.
In the cases of Higdon, Morgan, and Geffroy, the findings of the court will be separately filed.
Peck, J., concurred in this opinion.

An accomplished scholar, Mr. James C. Welling, assistant clerk of the Court of Claims, has pointed out tho fact that this maxim is a corruption of tho text of Cicero, Silent euim leges inter arma, and hardly entitled to be called a maxim of constitutional law. “ The saying,” as Mr. Welling remarks, “ takes its origin from Cicero, having been used by that great lawyer in the argument made in defence of Milo, when on trial for the killing of Clodius. Cicero, who was tho warm personal and political friend of Milo, appeared as his advocate before the judges selected to try him, and the great orator determined to rest his case on the theory that his client had killed Clodius in self-defence, under circumstances which rendered the killing of the latter justifiable, or excusable homicide. Having in the exordium of his argument briefly unfolded this view of the case, and excluded the idea that all acts of homicide were necessarily criminal, ho proceeded to say:
“ ‘There is then, judges, a law of this kind — not written, but inborn — which we have apprehended, drank in and extracted from nature herself; in conformity to which we have not been taught, but made; in which we have not been educated, but ingrained ; and this law is, that jf our life fall under peril from any ambush, violence, or weapon, whether of robbers or of personal enemies, recourse should be had to every honorable means to safety. For the laws are silent in the midst of arms.’ ”
Mr. Welling also cites Lord Coke as using the maxim in its original and proper form and
“And therefore when the courts of justice be open, and the judges and ministers of the same may by law protect men from wrong and violence, and distribute justice to all, it is said to be lime of peace. So, when by invasion, insurrection, or rebellion, or such like, the peaceable course of justice is disturbed and stopped, so as the courts of justice be as were shut up, et silent leges inter arma, then it is said to be time of war.” — Co. Litt. 249, b.
But the maxim is recognized in in its more modern sense by Sir James Mackintosh, in one of his greatest speeches, and the passage is quoted with approval by Sir Frederic Thesiger in the debate in Parliament upon the Ceylon disturbances. — Hansard, Vol. 117, p. 167 :
“ While the laws arc silenced by the noise of arms, the rulers of the armed force must punish as equitably as they can those crimes which threaten their own safety and that of society, but no longer. Every moment beyond is usurpation. As soon as the law can act, every other mode of punishing supposed crime is itself an enormous crime.” — Speech in the case of “Missionary smith,” Mackintosh’s Works, p. 734.