Milligan, J.,
delivered the opinion of the court:
This action is brought in the name of Charles C. Wentworth; but it is averred in the petition that Matthias Ellis and Joseph *306 Pratt are equal joiut owners with him. in the claim. The amount sought to be recovered is $12,343 83; and the claim is founded on the following facts:
On the 7th of November, 1864, the United States naval storekeeper at the city of Boston, for the Bureau of Steam Engineering, in obedience to a requisition drawn on him by the chief engineer on duty at that station, issued a requisition for 1,305 square feet boiler felting for the Paul Jones; 1,330 square feet boiler felting for the Mahaska; 3,650 square feet boiler felting for the Connecticut; 2,330 square feet boiler felting for the Dakota.
Again, on the 22d December, 1864, another requisition was issued by the same officer for the steamer Circassian for 2,500 ■square feet Cuthbert’s salamander boiler felting, two inches thick, backed with No. 1 flax canvas, and made in sections to suit a certain description of boilers.
These requisitions were marked on their face as “ open purchase requisitions,” in distinction from those drawn on contractors, and bore, as is usual in such eases, the words u immediate use.” They were both drawn on the navy agent at Boston, and officially signed by the storekeeper, and regularly approved by S. H. Striugham, commandant of the yard.
On the 16th of November, 1864, the chief engineer of the Boston navy yard wrote the navy agent stationed at that port as follows:
“ Sir : In order to secure the best article of boiler felting for the Government service, the following description will explain the exact kind that is required by requisition of 3d instant, viz: the felt to be two inches thick, secured to No. 1 flax canvas. It'must have the usual coating of salamander facing, or cement, composed of plaster of Paris and other substances. Such felting as was furnished for the United States steamer Bhode Island will not answer and will not be received.
“ The articles in question are wanted for immediate use.
“ Bespectfully,
“GEO. SEWELL,
“ Chief Engineer United States Navy.”
.The navy agent having on hand none of the felting required, and never having, as he states, purchased it before, except in a single instance for the steamer Bhode Island, which proved *307 unsatisfactory, be was compelled to make inquiry of those who dealt in felting and steam machinery in order to ascertain where the article required could be purchased. To that end he apifiied personally to Mr. Harrison Loring, builder of steam machinery, and to Mr. Nelson Curtis, of the Atlantic Works, and was informed that they did not know where it could be purchased. He then sent his messenger with open circular letters, containing a description of the article required, to the houses of Whitney, Bridges & Stearns, J. Schofield, an agent of a felting mill, William E. Coffin, B. Y. Pippey & Co., dealers, O. C. Went-worth, and Banker and Carpenter, contractors with the Navy Department. All the parties thus addressed resided in Boston, or its vicinity, and all declined to furnish the article, except the claimant, Wentworth, and Banker and Carpenter. They both made offers, of which the claimant’s was the lower of the two, and which was accepted by the navy agent, at $1 10 per square foot, and orders given to him, without delay, to deliver the article required to the naval storekeeper. In obedience to this order, the felting required by the chief engineer was subsequently delivered, in four lots, respectively, on the 24th and 31st of December, 1864, and the 19th of January and 30th of May, I860, and all regularly inspected, received, and used by the Government.
Triplicate bills were made out therefor, bearing on the face of each, with the inspecting officer’s approval, that “The public exigencies required the immediate delivery of the articles mentioned in this bill, and, as there was not time to advertise for proposals, they were properly obtained by open purchase, and the same is approved,” &c., which was officially signed “ S. H. Stringham, commandant.”
The first of these bills was forwarded to the Bureau of Steam Engineering at Washington for payment, and on the 31st of December, 1864, the Navy Department notified the navy agent at Boston that the bill was withdrawn, for the reason that the price charged for boiler felting was exorbitant.
After this, the other bills, with the same approval and statement of the commandant, were sent forward for payment with similar results. No complaint was made by the Department of the validity of the contract or the quality of the articles furnished. ■ The price only is complained of, as is fully shown by the letter of the chief of the Bureau, under date of the 24th of *308 January, 1865, in which the navy agent is directed to have new bills made out for the boiler felting for 50 cents per foot, which would be passed by the Bureau.
It further appears that the kind of felting required was not manufactured in Boston, but in the city of New York, and Avhen the claimant undertook to supply it he was not, so far as this record discloses the fact, apprised of its cost at the manu-factory. But subsequently, and when he bid for the supply of the steamer Circassian, he was apprised of the manufacturer’s price in New York, and that it did not cost at the manufactory more than about 45 cents per square foot.
The average price of the best quality of canvas-backed felting, about the date of these purchases in Boston, is shown to have ranged from 67 to 45 cents per foot and averaging about 58f cents; but no such article as the one required by the chief .engineer was found in that market, nor does it appear that any price was fixed for boiler felting made in sections to suit particular descriptions of boilers, as required by the chief engineer’s instructions, in the Boston market.
There is no satisfactory evidence that any of the naval officers had any fraudulent complicity with these transactions, or that they were even apprised of the manufacturer’s price at the time the first purchases were made.
The felting received and-used by the Government which has not been paid for, including a small lot of miscellaneous articles about which there appears to be no controversy, amounts, at $1 10 per square foot, to the sum of $12,244 33.
On the foregoing facts this claim is resisted on two grounds : First, that the contract is without authority of law; and, second, if made under authority of law, it is tainted with fraud, and therefore invalid.
1. The answer to the first point of objection involves the consideration of the acts of Congress approved March 2,1861, (12 Stat., 220,) and the act of July the 4th, 1864, (13 Stat., 396.) The words of the tenth section of the act of 1861 are: “ That all purchases and contracts for supplies or services, in any of the departments of the Government, except for personal services, when the public exigencies do not require the immediate delivery of the article or articles, or performance of the service, shall be made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or *309 performance is required by tlie exigency, the article or service required may be procured by open purchase or contract at the places and in the manner in which such articles are usually bought and sold or such services engaged between individuals.” * *****
The fourth section of the act of 1864 provides : “ That when an emergency shall exist requiring the immediate procurement of supplies for the necessary movement of an army or a detachment, and when such supplies cannot be procured from an established depot of the Quartermaster’s Department, or from the head of a division charged with the duty of furnishing such supplies within the required time, then it shall be lawful for the commanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the continuance of such emergency, but no longer, in the most expeditious manner, and without advertisement; and it shall be the duty of such quartermaster to obey such order; and his accounts for disbursement of moneys for such supplies shall be accompanied by the order of the commanding officer aforesaid, or a certified copy of the same, and also by a statement of the particular facts and circumstances, with their dates, constituting such emergency.”
The question of emergency arising under these provisions of the acts of Congress has been repeatedly adjudicated by-this court. And it may now be regarded as the settled rule of this court, that whether an emergency exists or not, is left to the discretion of the commanding officer of the army, or the detachment for which the services or supplies are required. His orders in that respect are made conclusive on the officers charged with obtaining the services or supplies required, and it would be often highly embarrassing to the movements of the Army and Navy were it otherwise. (Henderson’s Case, 4 C. Cls. R., 75; Reeside v. The United States, 2 C. Cls. R., 1; Maury v. The United States, ibid., 68; Crowell v. The United States, ibid., 501.)
In this case the record abundantly shows that the exigency was declared by Commodore Stringham, commandant of the Boston navy yard, and that the contract was made by the proper officer charged with the duty of procuring the supplies required. No question on that score can arise, nor is there any objection on grounds of authority to contract, urged by the Bureau of Steam Engineering against the payment of the *310 bills forwarded to the Department. The whole obstacle is found in the exorbitancy of the contract price, as shown by the Department’s offer to pay the bills at a reduced price.
It is the settled law of this court that when a contract has been fairly entered into by the United States, through their officers or agents lawfully competent thereto, an executive department cannot arbitrarily abrogate or change such contract to the prejudice of the party interested in its fulfillment. No objection is perceived to the legality of the contract under consideration, unless it be found in the manner in which the navy agent made the purchases required of Mm in open market. The law requires such purchases to be made “at the places and in the manner in which such articles are usually bought and sold, or such services engaged between individuals.” The felting required was of a peculiar description, and, as it afterward transpired, not to be found in the city of Boston, or elsewhere out of the city of New York. But the navy agent was not apprised of this fact in time to apply to the manufacturer for the fulfillment of the first requisition. He had never purchased the article required before, except in a single instance, for the steamer Rhode Island, and then not from the manufacturer, and which proved unsatisfactory, and he-was so informed by the chief engineer, in his letter directing the present purchases. In this state of the case, and in the absence of all knowledge where the article required could be procured, and its ruling price, he certainly could with reason infer it was as likely to be found in the city of Boston as elsewhere in the United States. The exigency was declared in that city, and but little time allowed to investigate other markets and procure the article at the lowest price at which it could be obtained from the manufacturer. With the knowledge he had wheu he made the first purchases, he used, we think, such means reasonably within his reach to procure the felting at a fair price, and to invite competition between bidders. To that end he made personal inquiry of dealers in felting and steam machinery, in the city of Boston, as to the places at which it could be procured, but without success. He then sent round an open circular letter to other dealers in felting, and navy contractors, invitiug competition and describing the article required j two only of whom returned bids, the lower of which he accepted. *311 and closed tlie contract at $1 10 per square foot for the first requisitions on the 18th of November, 1864.
It is difficult to see, under the peculiar circumstances of this case, what more the navy agent could have done to meet the spirit and meaning of the law. The acts of Congress do not impose impossibilities, and if they are construed with great strictness, they will fail to meet the object sought by the legislature. In time of war such statutes arc indispensable to the efficiency of the Army and Navy, and they must always be construed liberally. The diligence and care required of a purchasing agent, under such circumstances, we think no higher than that which a prudent, energetic man would exercise, in like circumstances, in his own business affairs. And we are not prepared to say, with regard to his first purchases, that he did not, under the facts of this case, reasonably conform to this rule.
But in respect to the second purchase, for the steamer Cir-cassian, we are forced to a different conclusion. In this case the requisition was not issued until the 22d of December, 1864, and the bids accepted and contract closed on the 4th of January, 1865. Ample time from the date of the first requisitions had elapsed to enable the purchasing agent and the contractor to inform themselves both of the place where the article required could be purchased and the manufacturer’s price. If the agent failed to avail himself of the facilities in these respects afforded him, and, to avoid trouble, purchased from middle men at a higher rate than he could have obtained the articles from the manufacturer, he cannot be held to have purchased within the meaning of the acts of Congress. We are satisfied from the record that this last purchase for the Cir-cassian was made after the navy agent and contractor had knowledge of the place where the felting required was manufactured, and its ruling price at the manufactory; and we cannot, therefore, uphold the contract at the rates charged for the felting obtained for the supply of the steamer Circassian.
But it was accepted and used by the United States; and on the ground of “quantum meruit” we feel authorized in holding that the claimant is entitled to recover its fair and reasonable value, which has been fixed by the Bureau of Steam Engineering at fifty-six cents per square foot.
2. In answer to the second objection urged against the claim, we need only remark that no fraud, either on the part of *312 the claimant or any of the officers or agents of the Government, is proven, and none can be presumed. The case stands, therefore, with the modifications before indicated, free from objections, and we hold the claimant entitled to recover as follows:
For 1,444 square feet felting, at fl 10, for steamer Mahaska. ¡§1,368 40
For 3,576 square feet felting, at $1 10, for steamer Connecticut.. 3,933 60
For 1,305 square feet felting, at $1 10, for steamer Paul Jones— 1,435 50
For 2,330 square feet felting, at $1 10, for steamer Dacotalr. 2,563 00
For 2,500 square feet felting, at $0 56, for steamer Circassian. .. 1,400 00
Miscellaneous articles. 292 00
Total. 10,992 50
For this sum, $10,992 50, judgment will be entered.