Downey, Judge,
delivered the opinion of the court.
The plaintiff seeks recovery, on different theories, because of the refusal'of the United States to accept and pay for certain Army bacon prepared for delivery during the month of March, 1919. The defendant disputes liability on any of the asserted theories and counterclaims because of alleged overpayment for bacon delivered during the preceding six. months and paid for.
There are practically three theories declared upon in the petition although there are subdivisions of two of them by reason of declaration upon somewhat different facts, resulting really in a petition in five counts. The three theories briefly stated are, first, on informal contract under the Dent Act; second, on contract under the general jurisdiction of this court; and, third, for just compensation on the .theory of delivery under a compulsory order, in effect a commandeering.
*402 It may not be inappropriate to suggest in the beginning the difficulty encountered in attempting to treat this case concisely, either as to findings or opinion, a difficulty partially apparent from the mere statement that we deal with a record of more than 3,000 printed pages. There are nearly 500 pages of orders, regulations, circulars, letters, etc., entailing a task of difficulty to bring into the findings such as may be essential to a fair presentment of the case and avoid the necessity of discussion of very many which do not aid a conclusion. We have felt justified, in the interest of a fair degree of clarity and brevity, in excluding much of this matter from the findings without obligation to first include it and then demonstrate by detailed discussion its immaterality.
It goes as a matter of common knowledge that in the ordinary course of events contracts for army supplies such as are purchased by the Quartermaster General are made after public advertisement and the submission and acceptance of bids and precede the furnishing of the articles contracted for. Such was the practice before the great war, and it was continued into the early stages of that conflict, but it was not long until the rapid increase in the number of men being drawn into Army service, with resultant and constantly increasing demand for food supplies, rendered further adherence to peace-time methods out of the question if service men were to be adequately rationed.
If we may view the transactions with which we have to deal in the light of the times — and it seems not only a •right but a duty to do so — we may well consider the situation which confronted the officers charged with the duty of feeding a vast and rapidly increasing army. The increase was not only rapid but its rapidity could not be accurately estimated no more than could its end be foreseen. The situation was without precedent, experience as a guide was absent, the responsibility was terrific. It is in the light of this condition that we are to consider some of the features of this case and determine the application of some of the documents appearing in the record.
Underlying this suit in all its features is the question of authority, a vital question in its relation to each of plain *403 tiff’s theories and one which finds a prominent place in the defense.
There were all sorts of organizations and reorganizations, and delegations of powers and limitations of powers, etc., much of it emanating from the office of the Director of Purchase, Storage and Traffic, General Staff, and some of the procedure might tend to the conclusion that all' authority, even that of the Quartermaster General, was vested in this bureau, but whatever the scope of this authority generally might have been, the conclusion is justified that, whether because he had it under the statute or because it was intended to give it to him, authority in matters such as those here involved was primarily in the Quartermaster General, and this we understand to be the view of both parties, eliminating any occasion for discussion. At a later period, under a reorganization plan, the Acting Quartermaster General was designated as and assumed the duties of Director of Purchase and Storage, so that from the standpoint of personality the authority remained as before, although under a different official designation.
The defendant’s expressed view as to the authority of the Quartermaster General is modified somewhat by the attached condition that his powers were to be exercised under the supervision of the Chief of Staff until the organization in the department of the Division of Purchase, Storage and Traffic in February, 1918, and the subject is treated as if the word “supervision” as used meant control. We have no desire arid do not find it necessary to go into any possible question as to the authority of the Chief of Staff, but it is proper to remember that the division referred to as organized in the department was an adjunct of the General Staff, that its head was a very distinguished officer detailed as an Assistant Chief of Staff and assigned to that duty, that the General Staff was a creature of statute, that at least for a time its powers were expressly limited by virtue of the provisions of the national defense act of June 3, 1916, 39 Stat. 166, and that one of the declared purposes of Congress in the writing of those limitations was to prohibit the absorption of authority delegated by statute to other bureaus.
*404 There were established within the Quartermaster Corps, pAirsuant to regulations, general supply depots for the purchase and storage of quartermaster supplies which were under the control of the Quartermaster General but directly under command of an officer designated as the depot quartermaster who was a purchasing officer, and a very important one of these depots was located before, during, and since the war at Chicago. On April 24, 1917, Colonel, afterward Brigadier General, Kniskern was relieved from duty as quartermaster, Central Department, and directed to take charge of the general depot of the Quartermaster Corps at Chicago, and on August 20, 1917, Major Skiles was directed to proceed to Chicago and report to the depot quartermaster for assignment to duty as his assistant.
General, then Colonel, Kniskern was relieved from duty as to this duty, and it is noticeable that he was giAmn this assignment Avithin less than three AA^eeks after the declaration of AA’ar and retained it until his retirement on September 1, 1919. There AAras no doubt then full comprehension of the importance and magnitude of the duties Avhich AA'ould clevoh'e on the depot quartermaster at Chicago in connection AA’ith the procurement of food supplies for the Army, and it must be assumed that consideration of his fitness and competency had to do with his selection for this important post. That the confidence reposed in him AAras not misplaced seems to us to be abundantly demonstrated by the record in this case.
It seems scarcely necessary tó go into a detailed discussion of the source of his authority, AAdiich primarily emanated naturally from the position he held, subject of course to the direction of his superior, or of the restrictions and limitations Avhich it is contended Aver'e throAvn about his exercise of that authoritjA and, if applicable, really cast upon his Avhole course of official conduct the stigma of illegality. And yet for months our rapidly increasing Army Avas adequately supplied, both at home and abroad, Avith immense quantities of bacon and other meat supplies purchased by General Kniskern, delivered and paid for, and we have no intimation of' a contention by any one that he Avas acting without full authority. An officer might make an isolated *405 purchase without authority and without the knowledge of his superior, but these purchases furnish their own repudiation of such a contention.
Many orders, circrdars, etc., which are in the record are referred to in detail in defendant’s brief and are the basis of the contention, as we understand it, that their provisions were applicable to the purchase of Army bacon during the war and that where, by those order’s, boards or divisions or committees were created in the Quartermaster General’s Office with'assigned powers as to - authorization, approval, etc., of purchases, they furnish a method of procedure which must be complied with in all cases, Army bacon included. There were a great many divisions in the Quartermaster General’s Office handling different classes of supplies and as to these there was no doubt a purpose to centralize, coordinate, authorize, supervise, and approve. But because such boards or divisions were created and no doubt served a- good purpose, it does not follow that the Quartermaster General, the superior authority over' all of them, might not authorize, direct, and approve other and necessary procedure in the matter of bacon purchases. We find it declared officially that the “ paramount consideration is uninterrupted supply.” The character of the supply, the time necessary in its preparation, the uninterrupted and constantly increasing demand, and the vital necessity are conditions which not only compelled the abandonment of peace-time methods but precluded the following of a path necessarily strewn with instruments of delay. As to these prescribed methods of procedure we have found that while they did not in terms except Army bacon from their provisions, they were never treated as applicable thereto. It would be passing str'ange if the Quartermaster General should find himself hampered in the discharge of such important duties by subordinate machinery in his OAvn office. ■ '
But the record more clearly, affirmatively, and indisputably discloses the authority reposed in General Kniskern in connection with the creation in Chicago on July 3, 1918, of a “packing house products branch of the Subsistence division of the Quartermaster General’s office.” There was such a division in the Quartermaster General’s office which *406 functioned for him in some respects in connection with subsistence supplies and it is quite apparent that it was to facilitate such matters and avoid any possible delay, that this branch was established in Chicago. It was located in the general supply depot of which the depot quartermaster was in command and it was directed that it was “to be under the immediate direction and control of the depot quartermaster, and to be responsible for all matters pertaining to the procurement, production and inspection of packing house products, subject to the control of the Quartermaster General.” If there were still room for any doubt as to the situation it is removed by General Wood, who was then Acting Quartermaster General and who, when called as a witness in this case, interpreted this order in a manner so consistent with the necessities of the situation as to be practically self evident and, by implication at least, in entire confirmation of our estimate as to the .capacity of General Kniskem. General Wood, speaking of this order, said that whereas the purchasing of supplies was concentrated in Washington, that “ Chicago being the food market, we delegated to General Kniskern the purchase of meat products and articles of that kind.”
Later on, under a reorganization plan, General Wood, the still acting Quartermaster General, was designated as “ Director of Purchase and Storage ” (purchase and storage were purposes for which general supply depots were established) and by order he created supply zones by territorial divisions and provided in the order that he appointed “ as his representatives in each general procurement zone the present depot quai'termaster to* act and be known as the zone supply officer,” he being “ charged with authority over and responsibility for supply activities within the zone under his jurisdiction.”
In connection with the consideration of this case it may be said that we are only concerned with authority as it existed at the particular times involved herein but not only is the scope of the case in one respect at least quite broad but other considerations seem to justify a rather comprehensive view of the whole situation.
*407 And in this connection, a matter which we hesitate to mention because we do not care to be regarded as indulging in criticism, we think it is pertinent to call attention to the fact that when this plaintiff’s claim was before the contract adjustment board and afterwards before the Secretary of War. no question of authority was at any time raised, and that apparently during the taking of testimony in chief by both parties there was no such question injected into the case. It seemingly made its appearance for the first time during the taking of testimony in surrebuttal by the defendant.
There is perhaps one other feature of this matter which should be mentioned due to the injection of the theory, predicated on evidence in surrebuttal, that another officer was clothed with authority as a purchasing and contracting officer, with jurisdiction over bacon purchases, and actually, under that authority, beginning in September of 1918, bought all the bacon. We hesitate to comment on some features of this situation as developed in the testimony, and will only call attention briefly to official orders set out in Finding VIII and necessarily related suggestions.
The contention is predicated primarily on the order first referred to in that finding by which on September 27, 1918, Captain Jay C. Shugert, Quartermaster Corps, was appointed purchasing and contracting officer for “ the packing house products and produce division of the office of the depot quartermaster at Chicago.”
From what has already been said with reference to the creation on July 3, 1918, of “the packing house products branch of the subsistence division of the Quartermaster General’s Office” and the conclusive interpretation put on that order by General Wood there is no room for question that the authority in the -matter of bacon purchases reposed here. Captain Shugert was not then at Chicago and it is to be noted that his later appointment referred to was not in “the packing'house products branch of the subsistence division of the Quartermaster General’s Office,” still then in existence, but in a different service characterized as a “ division of the office of the depot quartermaster.” The terms are *408 quite similar, indeed so much so as to indicate a possibility of no real distinction in scope of authority, but in important respects they were quite different, and if it should be contended that there was no real difference and that Captain Shugert’s appointment vested him with authority in “the packing house products branch of the subsistence division of the Quartermaster General’s office ” it is only necessary to noté from other orders set out in the finding that in January, 1919, there was a transfer, indicating thereby a clear distinction, and an elimination as a division of the depot, and on another day a “ change order ” of the depot relieving Captain Shugert '.from further duty in the packing house products “ division ” (of the depot) and assigning him with others as “ assistants to the officer in charge packing house products branch, subsistence division, Office of Director of purchase.” This.branch of the subsistence division Quartermaster’s office had been transferred in connection with a reorganization referred to above to the office of the Director of Purchase and Storage, the same officers in charge under different official designations. The facts as to the transfer are set out in Finding YI.
When the developments already cited indicated the clear necessity of resort to more expeditious methods of procuring" bacon, General Kniskern called into conference representatives of the seven large packers, plaintiff included, upon whom of necessity chief reliance must be placed for adequate supplies, and repeated conferences eventuated in the plan which thereafter was followed. In substance it was that General Kniskern or Major Skiles, his assistant, or frequently both of them, would at intervals hold a conference with, the packers and notify them of the amount of bacon, canned meats, .etc., which would be required during a stated period, usually three months, and approximately two months in advance because of the time required for preparation. Each packer was requested to propose as soon as possible the quantity-of each desired product it could undertake to furnish, and this they did in writing usually within two or three days after the conference. Afterward they were informed in writing as to what they should furnish either by an acceptance or modification of their proposals. They were *409 requested to proceed at once with preparation of the product and, certain elements of cost being then uncertain, it was agreed that prices would be determined about the first of each month and purchase orders thereafter issued as a basis of payment.
The depot quartermaster was supplied with War Department forms of proposal which were used by bidders when following usual peace-time methods in submitting their competitive bids, and when the time came-near the beginning of each month for the packers to submit their prices for that month on the product already awarded and then necessarily in course of preparation, these forms were sent out to the packers as a matter of convenience, but they were intended to be used merely for the submission of prices on the product already awarded, and in no sense for the submission of competitive bids. If the prices submitted were satisfactory, they were accepted as submitted, otherwise adjusted to a satisfactory basis. It was understood that the prices would be based on cost of production with a profit added within the limits fixed by the Food Administration, which was 2% per cent on gross cost, and this basis prevailed without change so long as this method was in vogue. Sometimes, by reason of varying costs, prices were fixed twice a month. At a convenient time after the prices had been fixed the purchase orders were issued, hot as authority to produce, for frequently the product had already been not only produced, but delivered, but as a necessary basis of payment.
There iras modification of this plan in that in July, 1918, the food purchase board, organization of which is recited in the findings, concluded that because of the shortage which had developed in the supply of bacon and canned meats these products should be placed on an allotment basis under the Food Administration, and thereafter there were allotments, of which we shall speak hereafter, and for the months of September, October, November, and December the prices were fixed by the Food Administration, but on the same basis of cost and profit as theretofore.
The Food Administration began preparing to go out of business and in the respects herein involved ceased.to function in December, 1918. Thereafter for the months of Janu *410 ary and February, 1919, ¡Drices were fixed as they had been previous to September and for the products of those two months purchase orders were issued as theretofore, but in addition formal contracts were afterward prepared covering-those two months, three covering the month of January and one the month of February. The purchase orders for January and February were both issued in February, that for February in fact preceding that for January, due to the fact that the purchase order for January issued February 10 was in lieu of one issued January 4 and for some reason canceled. The formal contracts for Jamiary Avere dated February 10, approved by the Board of RevieAV, February 26th, and executed by Swift & Company, March 8,1919. The contract for February deliveries Avas executed by the representatives of the United States “as of the fourth of February, 1919,” the date of the purchase order, the actual date of execution not being shoAvn, approA^ed March 1,1919, and executed by Swift & Company, March 12, 1919.
It should perhaps be noted that all bacon purchased of the plaintiff under the plan above indicated, from its inception to and including the month of February, 1919, Avas accepted and paid for and so far as appears of record, no question Avas ever raised either as to procedure or price.
We deem it axhdsable noAv, and before considering other theories, to address ourselves to plaintiff’s case upon the theory of a contract Avithin the general jurisdiction of this court under section 145 of the Judicial Code.
What has been said presents a general vieAV of the whole situation and renders us familiar Avith the circumstances surrounding and the reasons for the procedure involving bacon production for delivery in March, 1919, the subject of the controversy here. These circumstances throw light on the whole situation and illuminate the intention of the parties. As Ave may consider surrounding circumstances to aid in the interpretation of an ambiguous contract so may Ave AdeAV the transaction here involved through the atmosphere of the times to the end that our vision may correctly interpret the actions and intentions of the parties.
The particular procedure involved here as determinative of the question as to Avhether there was a valid contract for *411 bacon for March, 1919, delivery, is set out in full in Finding XYI, and we shall endeavor to avoid much of detailed repetition. The underlying features are, in the light of the facts stated as to one of these conferences held on the 9th of November, 1918, at which the representatives of the seven large packers were informed of the need of 60,000,000 pounds of bacon for January, February, and March, 1919, the proposal of Swift & Company, the request of General Kniskern to the Food Administration for allotments, the allotments to Swift & Company, Swift & Company’s acceptance, and General Kniskern’s notice to Swift & Company as to deliveries to be made by them.
In this connection it is to be noted that the plaintiff theoretically derives contracts from these communications in two different forms: First, as growing out of Swift & Company’s offer, the Food Administration’s allotment, and Swift & Company’s acceptance; second, Swift & Company’s offer and General Kniskern’s acceptance, and relative to the action of the Food Administration it seems to be the theory that that action may be treated in two ways, each eventuating" into a contract, that is, either as an acceptance of Swift & Company’s' offer or as an offer on the part of the United States, accepted in turn by Swift & Company.
These different theories in so far as they incorporate the action of the Food Administration as a contractual element render necessary a consideration of the status -and authority of that organization.
In August, 1911, after the passage of the food control act, approved on the 10th of that month (40 Stat. 276) the President, by Executive order, created the United States Food Administration and delegated to it all the powers and authority given him by that act.
The title of the act indicates that its purpose was to provide further for the national security and defense “by encouraging the production, conserving the supply and controlling the distribution of food products and fuel,” and in the first section it was declared to be essential, among other things, to assure an “ equitable distribution ” of food. These quoted words are lifted out of the context because *412 they seem to indicate the purpose of the act which was manifest in the allotments with which we deal in this case.
The Food Administration was an instrumentality of the Executive, and when we deal with war times we do not with good grace question the authority of the Executive or his instrumentalities, but for the pxirposes of this case there seems no occasion to deal witli the Food Administration for the purpose of determining the effect of its action otherwise than as its authority and purpose is revealed by the act itself.
We can find in the Food Administration, at least in its relation to transactions such as those here involved, no authority to contract nor can we find in the record, in connection with its allotments of bacon, any evidence of intention or attempt to contract.
Through a board, the extent of whose authority we need not discuss but the purpose of which was manifest, bacon and canned meats were on July 16, 1918, placed on an allotment basis “on account of the shortage which had developed.” The purpose seems apparent from the statement itself and it naturally invoked the power of the Food Administration to assure an equitable distribution. There was nothing in the situation to suggest any reason why the Food Administration 'should assume to make contracts. There was reason suggested why it should look after distribution of available supplies “to prevent,” as said in the act, “locally or generally, scarcity, monopolization, hoarding,” etc. Since Army bacon was scarcely a commercial product there would seem to be little occasion for the action taken, but this was a feature of the matter probably given no consideration. The activity of some war-time instru-mentalities was commendable even if the-results were not apparent.
When, therefore, General Eniskern, having received the proposal of Swift & Company on November 12, following the conference of November 9, and having determined that Swift & Company should be assigned the production of 6,000,000 pounds of Serial No. 10 bacon .for January delivery, 5,500,000 pounds for February delivery, and 6,000,000 pounds for March delivery, he requested of the Food Ad-' *413 ministration allotments, among which these amounts to Swift & Company were included, and the Food Administration on December 3,1918, notified Swift & Company that, on requisition of the packing house products branch, subsistence division, Quartermaster General’s office, they had been alloted the identical amounts stated for each of the three stated months, it was nothing but an authority to Swift & Company from the Food Administration, in the exercise of its power to control distribution, to furnish that much bacon in those months to General Kniskern, representing the packing house products branch, subsistence division, Quartermaster General’s office, and to that authority Swift & Company were referred for any furthei information. ■
If, therefore, these documents set up in Finding XVI are to be construed as constituting a contract for the bacon in question, the allotment by the Food Administration is to be regarded as but the authority from the allotting power to Swift & Company and General Kniskern to enter into a contract for that much bacon.
In considering the question of a contract under circumstances involving a departure from established methods it may be observed first that the transaction is in any event relieved from infirmity because there was no advertising forbids. Section 3109, R. S., no matter how it may be construed in other respects as affecting a case such as this, is certainly to be construed, in connection with the order of the Secretary of War set out in Finding III, as relieving from the necessity of advertising. It is true that whatever the exigencies there could not be immediate delivery because of the time necessary for preparation and in that sense the transaction could not be within the strict letter of the statute, but it was Avithin the true spirit thereof, in addition to which it is apparent that to require advertising would have been but to require a' vain thing, a situation such as results Avhen there is but one possible bidder, since the purpose Avas not to pro ■ cure competition bids for a quantity well within the available supply but to procure all of that supply.
The effect is therefor for determination, following such a conference as had been held many times before and for the *414 same purpose, of the submission of a proposal in writing- by the plaintiff and its acceptance thereafter in writing by the authorized representative of the United States, the proper authorization or allotment by the Food Administration having intervened, the resulting contract, if one did result, being for the period of three months with stated quantities for delivery in each one of those months and having been fully performed as to the first two of those months and at least partially performed as to the third.
Preliminary to the main question for consideration we may note the suggestion that the proposal was to furnish 17,500,000 pounds of serial No. 10 bacon and 4,000,000 pounds of serial No. 8, apportioned to the three months, and that the acceptance of General Knistern was not in the terms of the proposal in that the acceptance authorized the furnishing only of the serial No. 10, the canned bacon.
The need stated for these three months at the conference of November 9 were for 60,000,000 pounds divided equally between serial No. 8 and serial No. 10, but there was no requirement that each packer should assume to furnish the same quantity of each, and when the plaintiff proposed to furnish a larger quantity of serial No. 10 than of serial No. 8, attention was called to the installation of a canning plant at great expense, and it was said that the amount of serial No. 10 which it was proposed to furnish was the minimum amount required to operate its canning plant at fair capacity. It was thus apparent that the plaintiff was seeking an award of serial No. 10 in the quantity proposed, and in perference to serial No. 8, award was made to it for that exact quantity of serial No. 10, with reference to its proposal on serial No. 10, and the fact that the acceptance did not also include the serial No. 8, covered by the proposal, can not be regarded as any such variance as would create an infirmity in the transaction in the absence of specific acceptance of the modification. The circumstances did not justify the implication that it was such a proposal as must be accepted in toto or not at all, but, on the contrary, the terms of the proposal implied a right to modify as to quantities of either or both kinds within the limits of the total proposal.
*415 As against a conclusion that plaintiff’s proposal or offer in writing and General Kniskern’s response, equivalent to an acceptance, gave rise to a valid contract, the provisions of section 3744, It. S., are vigorously urged. By that section it is made “the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior to cause and require every contract made by them severally on behalf of the Government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof,” followed by provisions with reference to the filing of a copy in the returns office of the Department of the Interior.
The section finds its origin in the act of June 2, 1862, 12 Stat. 411, which Avas entitled “An act to prevent and punish frauds on the part of officers intrusted with making of contracts for the Government,” it imposed a duty on the officers named and succeeding sections taken from the same act impose a penalty on these officers for a violation of its requirements. The statute does not in terms address itself to the validity of the contract and it is not provided that noncompliance there Avith shall render a contract other Avise made void. But in the Clark case, 95 U. S. 539, appealed from this court, it AAras held that the contract is itself affected and must conform to the requirements of the statute, and, further, it aauis held that the statute in question was intended to operate as a statute of frauds. And the conclusion of the court must have been predicated upon a consideration of the statute as a statute of frauds, for while the plaintiff was not permitted to recover for the Avalué of his boat, his rights in that respect being treated as those of a bailor, he was permitted to recover the value of the use of the vessel for the time she AAras in the hands of the Government. This contract, it is to be noted, was in parol and it is said, “We do not mean to say that where a parol contract has been wholly or partially executed and performed on one side, the party performing Avill not be entitled to recover the fair value of his property or services.”
This case was a pioneer in the construction of this statute and resulted in some differences of opinion, evidenced by the *416 dissent of three members of the court, and because of its rather striking applicability to the instant case, we deem it not inappropriate to quote a paragraph from the dissenting opinion of Mr. Justice Miller, as follows:
“If there is any branch of the public service where contracts must often be made speedily, and without time to reduce the contract to writing, it is in that of the army. Sudden occasions for supplies for the occupation of buildings, for the transportation of food and munitions of war, are constantly arising, and in many of them it is impossible to do more than demand what is wanted and agree to pay what it is worth. Did Congress intend to say that the patriotic citizen, who said £ take of mine what is necessary,’ is to lose his property for want of a written contract, or be remitted to the delays of an act of Congress % ”
But the question here involved does not turn upon the validity of a contract in parol. It hinges upon an exchange of instruments in writing, each signed by one of the contracting parties.
And in this connection there should no doubt be reference to the act of March 4, 1915, 38 Stat. 1078, applying to quartermaster’s contracts, with which class this case deals, wherein it is provided that contracts made by the Quartermaster General, or by officers of the Quartermaster Corps authorized to make them, which are not to be performed within sixty days and are in excess of $500.00 “shall be reduced to writing and signed bjr the parties,” omitting the words “ with their names at the end thereof,” and providing that in all other cases they shall be entered into under such regulations as may be prescribed by the Quartermaster General. The purpose of this act was probably to dispose of controversies which had arisen as to the effect of several antecedent acts, exempting certain classes of purchases in certain circumstances from the operation of section 3744, and to the extent that its terms are at variance with the provisions of that section it must be regarded as an amendment thereof. If it affects this case it is only because it lends countenance to a conclusion that section 3744 may be complied with without the appending of the signatures of both parties on the same paper “ at the end thereof.” But that has been determined irrespective of this act.
*417 In the recent case of American Smelting & Refining Co. v. United States, 259 U. S. 75, affirmed on appeal from this court, in which the contract was by the Ordnance Department, it ivas held that tiro letters, one submitting a proposal and the other accepting it, constituted the contract, notwithstanding the fact that the execution of a formal contract was contemplated and unaffected by the fact that there were repeated requests that the plaintiff should sign a formal contract which it ultimately did under protest, “because” it is said, “ these facts in no way modify the relation of the parties under the contract by letters already made.” Further it is said that remedy is excluded under the act of March 2, 1919, 40 Stat. 1272, commonly called the Dent Act, a statement predicated, it must be inferred, on the conclusion that there was no such informality in the contract as brought it within the purview of that act. There are other statements in the opinion in this case possibly valuable for reference hereafter.
In United States v. New York & Porto Rico Steamship Co., 239 U. S. 88, a Navy case, it is said that “of course the statute does not mean that its maker, the Government, one of the ostensible parties, is guilty of unlawful conduct, or that the other party is committing a wrong in making preliminary arrangements, if later the Secretary of the Navy does not do what the act makes it his duty to do,” and the opinion concludes with the statement that “even when a statute in so many words declares a transaction void for ivant of certain forms, the party for Avhose protection the requirement is made often may Avaive it, Amici being held to mean only Amidable at the party’s choice.” And if the learned justice had had occasion to go further and consider the circumstances under which there might be an election to declare a voidable contract Amid, he Avould no doubt haA’e held, in line Avith Avell-established principles, that no such right remained after performance.
In United States v. Andrews, 207 U. S. 229, the contract Avas made by correspondence, and in considering the contention that the contract did not conform to the requirements of section 3744 it is said, “ but it is settled that the invalidity *418 of a contract because of the noncompliance with the section referred to is immaterial after the contract has been performed,” and St. Louis Hay, etc., Co. v. United States, 191 U. S. 159, is cited.
The case cited is no doubt referred to as an authority on the proposition stated therein that “ the invalidity of a contract is immaterial after if has been performed.” There are other features of the case of some interest, but the pertinent propositions are the holding by this court that the advertising, proposal, and acceptance did not constitute a valid contract because not in compliance with section 3744, which holding- the Supreme Court approved, but, after stating the proposition above quoted, with some elaboration, cites the fact that actions on the part of the United States of which complaint was made were but the exercise of rights “ which were reserved in the fullest and most express terms ” and that there was no breach, concluding that there was no valid claim “ because the United States has done all that it undertook to do.” The gist of the case is that the procedure had created no valid contract because not in compliance with section 3744, but that the invalidity was immaterial after performance and the rights of the parties are considered under the terms of the contract which was invalid but for performance.
The South Boston Iron Co. case, 118 U. S. 87, cited by the defendant, affirmed this court on appeal. The plaintiff made two separate proposals to the Navy Department to furnish boilers for naval vessels and both were accepted in writing by direction of the Secretary. A few days thereafter plaintiff was notified by the Secretary of the Navy to “ discontinue all work by you contracted for with this department ” since March 1, 1877, until otherwise directed, etc., and, failing to procure a settlement of a claim presented, suit followed in this court.
The opinion of the Supreme Court is very short, refers to the Clarke ease, holds that the papers relied on were nothing-more than preliminary memoranda made by the parties for use in preparing a contract, which was never done, and says that within a few days the whole matter was abandoned by *419 the department and that the Iron Company had neither performed any of the work or been called on to do so.
The proposals, which were apparently on the plaintiff’s own initiative based on information received from some undisclosed source and without any invitation to submit, were to furnish boilers, as may be required, according to drawings and specifications which in fact were not then in existence, and the acceptances both stated that “The specifications and drawings will be furnished as soon as possible.”
The uncertainty as to what the plaintiff was to do was strongly urged by the defense in this court, and Judge Richardson in his opinion cites the uncertainty by stating that “ If it should be held that these papers constitute valid contracts against the Government, it is not at all clear that they have been broken by the defendants. The claimant’s proposals state that he has ‘learned that, new boilers are required for: certain ships, and then says, ‘ I will build such new boilers as may be required for the above-named ships,’ etc. This language implies conditions as to the requirements of the service apparently to be settled in the future, ” with further comment along the same line.
It is true that the case was not turned on this condition, for it was held that so much of section 3744 as provides that contracts shall be “ reduced to writing and signed by the contracting parties with their names at the end thereof ” is mandatory and “ contracts which do not comply with its requirements are void,” but the line of argument is addressed largely to the proposition that “ a whole and complete contract was not signed by either party, ” and stress is apparently put upon the conclusion to be drawn from the use of the words “ at the end thereof ” and to the extent that significance was given to those words it could not prevail under the apt of March 4, 1915.
Necessarily it is what the Supreme Court said which is governing, hut it is noticeable that the case in this court, developed so much of uncertainty that there was apparently no room to hold that these papers could by any possibility make a contract and so this court said “ they are only preliminary memoranda to be used.in drawing a contract” and *420 the Supreme Court said “We agree with the Court of Claims that the papers relied upon for that purpose are nothing more in law or in fact than the preliminary memo-randa made by the parties for use in preparing a contract for execution in the form required by law” and, upon a review of the case, it would seem not only that the statement was entirely true, but that under the circumstances there was room for' no other, although not to be taken as enunciating a principle applicable where the facts may not lit. As possibly of significance in another view, it is to be remembered that having announced the conclusion quoted above as to the purpose and effect of these papers it was regarded as proper to add that the plaintiff had neither performed any of the work or been called on to do so.
In Harvey v. United States, 105 U. S. 671, too long to review in more than one feature, the commanding officer of the arsenal at Rock Island, Ill., had advertised for bids for the construction of piers and abutments for a bridge, plaintiff had submitted a bid in writing which the officer had accepted in writing, after which a formal contract was signed by both parties. Controversy arose in one respect, as to whether the plaintiff was required to construct the necessary coffer dams, and the question was decided in the affirmative by this coxirt on a construction of the formal contract. After a subsequent procedure under a special jurisdictional act, in which this court refused to reform the contract, the case was appealed, and after a lengthy revieAv the Supreme Court, upon the point of interest here, said, “ The written bid in connection with the advertisement, and the acceptance of that bid, constituted the contract between the parties, so far as regards the question whether the contract price embraced the coffer-clam work,” citing Garfielde v. United States, 93 U. S. 242; Equitable Insurance Co. v. Hearne, 20 Wall. 494; and “The written Eontract, in that respect, was intended by both parties to be merely a reduction to form of the statement as to work and prices contained in the bid,” -a statement not inconsistent with the idea that this “ reduction to form ” might furnish compliance with section 3744, although that view of the matter is not suggested; but after *421 discussion bearing upon the question of reformation, it is further said in significant language, in which we take the liberty of italicizing a word, that “ We are of opinion that, by the actual contract between the parties, the appellants Avere not to do any of the Avork coArered by the claim made by them under item 1 of# the petition herein (the coffer dams), and that the Avritten contract must be reformed accordingly.” The contract referred to as the “actual” contract AATas, of course, that AAThich it said the advertisement, the bid, and the acceptance constituted.
In Brown v. District of Columbia, 121 U. S. 579, the validity of a paving contract Avas involved. The authority Avas in the board of public works, there. Avas a statute in force requiring that “ all contracts made by the said board of public works shall be in Avriting and shall be signed by the parties malting the same and a copy thereof shall be filed in the office of the Secretary of the District,” and the contract AA'as by proposal and acceptance in Avriting by the secretary of the board. The contract was held invalid because it Avas concluded that the proposal had neA'er, in fact, been before the board for action, but it is said:
“The appellant contends that the alleged contract sued upon meets the requirements of paragraph 37 of the act of February 21, 1871, Avhich proAÚdes that ‘all contracts made by the said board of public works shall be in writing, and shall be signed by the parties making the same, and a copy thereof shall be filed in the office of the secretary of the District;’ and that the contract sued upon being a formal proposition in Avriting, and an acceptance thereof in Avriting signed by the secretary of the board, Avliose authority to sign the same is not denied, and whose genuine signature thereto is admitted, Avas a Aralid contract binding upon the parties.
“ Numerous authorities are cited to sIioav that the Avritten acceptance by one party of a Avritten proposal made to him by another party creates a contract of the same force and effect as if formal articles of agreement had been Avritten out and signed by said parties. The legal principle asserted is sound, but the fallacy of the argument lies in the assumption that the proposition of the pavement company was m fact submitted to the board, and that the latter did in fact authox-ize the letter to be Avritten by Secretary Johnson accepting the said proposition.”
*422 There are cases in this court to which we are referred, not involved on appeal in the decisions of the Supreme Court above reviewed, but Avith perhaps two or three exceptions they add nothing to what has been said. Apparently inconsistency results from the following of decisions of the Supreme Court subsequent to rulings made. .
The Wentworth case, 5 C. Cls. 302, justifies an open market purchase under the act of March 2, 1861, afterward section 3709, R. S. In Cobb, Christy & Co.,. 7 C. Cls., 470, the purchase was held authorized by the act of July 4, 1864, an emergency war measure to operate only within a limited time, as also in the Vpdegraf ease, 8 C. Cls. 514, and in the Thompson case, 9 C. Cls. 187, but the last three mentioned cases are in effect overruled by Cobb, Blasdell Co., 18 C. Cls. 514, which is apparently founded on the Glark case and, besides other infirmities, invokes and applies the act of June 2, 1862 (sec. 3744 R. S.). In the Pacific Steam Whaling Co. ease, 36 C. Cls. 105, an emergency purchase, the emergency being indicated by a special relief act, was held not to be within sec. 3744, and this case is cited in the case of Moran Brothers Co., 39 C. Cls. 486, in which case it is held that a transaction involving an emergency came within sec. 3709, “ which obviates the necessity of reducing the contract to writing.” In Johnston’s case, 41 C. Cls. 76, it was held that “ while it may be admitted that a written contract may be made out under that section (3744) by letters of correspondence between the parties” the absence, in that case, of the proposal was a fatal defect, which could not be supplied by the reply thereto and acceptance of conditions therein. In the case of the Export Oil Corp., 57 C. Cls. 519, in which a demurrer was sustained to the petition, the contract was oral and no performance was pleaded. Section 3744 was held mandatory and 3709 not applicable.
The Monroe ease, 184 U. S. 524, is strongly urged by the defendant upon another theory than that involved in the foregoing considerations. An Engineer Corps contract, reduced to writing was involved, in which it was specifically provided that “ This contract shall, be subject to the approval of the Chief of Engineers of the United States Army ” and the contract was held invalid because not so approved. It *423 would be difficult, if one were disposed, to find ground for exception to the conclusion in that case. The condition was a matter of express agreement between the parties and it in effect retained in the Chief of Engineers the authority to contract. The analogy is found by the defendant in an order of the Quartermaster General’s office creating a Board of Contract KeAÚeAAr, and it is contended that no contract AAras enforceable unless first approved by this board “because something further remained to be done in order to make it a finality.” We have already adverted limitedly to the question of the applicability of many existing orders and regulations to contracts such as those here involved, and there is a finding on the subject. The order or “Notice” as it is called, here involved, Avas issued from the office of the Quartermaster General, covered so many subjects that more than 20 printed pages are required for its reproduction, and superseded former similar notices. It recites that its purpose is to insure proper control over purchases. In the light of what has already been made to appear as to the attitude of the Acting Quartermaster General with respect to bacon and similar purchases, it is scarcely reasonable to assume that he intended that authority rested where and exercised as he intended it to be exercised, could not find sufficient Avarrant in his authorization without first procuring action at the hands of his subordinates whose poAArers, proper for exercise in many respects, were never intended to function in the respects here hrvolved.
There are, of course, many cases that might be cited in AA'hicli section 3744, or some similar statute is not involved, sustaining the rule that a proposal and acceptance may constitute a valid contract. Indeed, such a rule is so self-eA’idently correct that question is scarcely conceivable for it partakes much more of formality than does the rule of validity of parol contracts when not within the statute of frauds.
In the light of some of the authorities cited the conclusion is justified that in the matter of governmental contracts a proposal in Avriting signed by the proposer and an acceptance in writing signed by an authorized officer is a sufficient compliance with section 3744, and particularly *424 with that section as modified or amended in respect to Quartermaster contracts by the act of March 4, 1915. A modification of the stringent rule of section 3744 is apparent from the language of that section compared with that of the act mentioned, but it is also apparent from the discussion of the section in some of the cases that stress was put upon the concluding words, “ with their names at the end thereof,” which were omitted from the act. It is suggested in the opinion of this court in the South Boston Iron Co. case, 18 C. Cls. 165, wherein the Supreme Court approved the view of this court as to the characterization of the writings involved! as “preliminary memoranda,” that “negotiations, correspondence, proposals, and acceptances, although conducted in writing, but signed only in part by one party and in part by the other, do not constitute the required complete contract signed in whole by both parties,” and “ a whole and complete contract was' not signed by either party. The claimant signed the proposals and the defendants the acceptances,” language, the use of which may well be doubted if the act referred to and not section 3744 above were for consideration.
But if there be doubt whether, without more, a proposal and acceptance in writing may be held to be a sufficient compliance with the statutes referred to, it is held, and upon this question there seems to be no division of opinion, that “the invalidity of a contract because of the noncompliance with the section referred to is immaterial if the contract has been performed.”
The application of this principle to the instant case, renders necessary a consideration of the question of performance, not onty because of its essential character as the foundation of the rule, but because of some contentions by the defendant. The briefs are so lengthy and the arguments so much in detail upon every conceivable phase of the case that it is impossible in an opinion, already undesirably long, to refer to them specifically, but some involved matters must be inferred to, the application to be made where proper.
Involved in the question of performance as well as in other contentions of the defendant, is the scope, or per- *425 liaps we should say subject matter, of tlie contract. The fundamental error is that, as a basis for argument, the contract. assuming that there was one, related only to bacon supplies for the month of March, 1919. It is entirely true that this suit relates only to bacon for March delivery since that for January and February was manufactured, delivered and paid for and therefore as to it there is no controversy, but the fact that March bacon is alone the subject of the suit does not justify the treatment of the contract as a contract for March alone.
From the inception of the transaction here involved bacon for January, February, and March deliveries was the matter to which the parties addressed themselves. At the conference of November 9, the total needs for the three months were made known. The plaintiff’s proposal, the Food Administration’s allotment, in so far as that is material, and General Kniskern’s award all covered the three months. Any separation of the month of March and its treatment as a matter of independent negotiation is. therefore, unauthorized.
It follows then that there was full performance of the January and February portions of the contract, and a partial performance as to the month of March, on the basis of the original provision as to that month, or a full performance if the contract as to that month be deemed modified.
Some of the authorities cited justify the conclusion that a partial performance is sufficient for the purpose of the rule under consideration and if, so stated, it is of doubtful application, the doubt is removed when it is added that if one partially perform and is ready and willing to complete performance but is prevented or induced therefrom by the other, the latter may not take advantage of failure to fully perform. Under the facts of this case it. seems to us that for the purpose under discussion the plaintiff is entitled to the benefits of full performance, but there is another view of the matter leading to the same result.
By the letter of January 24, 1919, General Kniskern informed Swift & Company that due to the rapid demobilization of the Army and constantly decreasing demand, the Government would not be in the market for certain named *426 products for March delivery, except that such bacon as was already in cure above Avhat was necessary to complete February deliveries, and had been passed by the inspectors, would be accepted. This was in the nature of a modification or partial cancellation and was readily acquiesced in by the plaintiff. Plaintiff having alreacty in cure sufficient bellies to complete February deliveries had commenced on January 13, to put bellies in cure for March deliveries and from that day until the receipt of this letter had each day been putting bellies in cure under Government inspection. On receipt of this letter they conformed thereto by ceasing to put any more bellies in cure and notified Squire & Co., to do likewise, with which instruction they complied. The proposal of General Kniskern to accept such quantity of “ bacon ” as was already in process of cure necessarily implied that the bellies in cure should be smoked, without which it Avas not “ bacon,” and canned, without Avhich it AA’as' not “ Serial 10.”
Under erroneous date of February 5, 1919, instead of March 5, there Avas further modification by notification that bacon in smoke in excess of that required for February de-Hweries Avould be acceiffed but that no more should be put in smoke and although there was then in cure at the SAvift plant 417,881 pounds of bellies and at the Squire plant 650,-658 pounds which had not yet been put in smoke, and which the letter of January 24 had stated Avould be accepted, the plaintiff acquiesced also in this modification and notified Squire & Company to act accordingly.
It seems quite clear then, for the purposes of the stated rule as to the effect of performance, the plaintiff is entitled to the benefit of full performance. It was to its credit that it made no objection to complying with the instructions of General Kniskern and it would be inconceivable to invoke a rule which should penalize it for so doing. It should not be put in a worse position by the refusal of the defendant to accept full performance and be made to suffer by reason of its willingness to accede to modifications of the contract prompted by the best interests of the Government. It did all that it Avas asked to do, and so far as obligations were laid upon it the contract was fully performed.
*427 It is urged as against a conclusion that these exchanges constituted a contract that, so considered, they were incomplete in that a vital element was lacking by reason of the omission of any fixed price, hut such a contention is without force. If the price had been left wholly out of consideration and there had been no understanding between the parties with reference thereto and no understood basis upon which it was to be arrived at, the contention would at least have rested on a plausible foundation, but such is not the case. There were manifest reasons, in the interest possibly of one, possibly of the other party, why the fixing of the price should be deferred, it was so agreed, it was, in the instance here involved, in accordance with usage in this respect, and the basis upon Avliich the price would be fixed was thoroughly understood.
“ Undoubtedly the existence of a separate oral agreement as to any matter upon which a written contract is silent, and which is not inconsistent with its terms, may be proven by parol, if under the circumstances of the particular case it may properly be inferred that the parties did not intend the Avritten paper to be a complete and final statement of the whole of the transaction between them.” Seitz v. Brewers Refrigerating Co., 141 U. S. 510.
In Williston on Contracts it is said, “ It has long been settled, that, in commercial transactions, extrinsic evidence of custom and usage is aclmissable to annex incidents to ■written contracts, in matters with respect to which they are silent ” (section 652) and in a case noted it is said, “ Usage enters into every contract and may be shown not only for the purpose of elucidating the contract but also of completing it,” and in section 660 it is said, “ The real question where usage is concerned is whether the parties contracted with reference thereto,” and “ a habit of business confined to the two parties to a contract may by implication be adopted as an unexpressed part of it.”
In this instance the parties had adopted a plan calculated to meet the exigencies of the situation; it involved the fixing of prices at approximately the first of each month; it had been followed for a considerable time with apparent satisfaction to both parties; prices had been determined on the *428 same basis whether determined between the parties or fixed, as was done for four months, by the Food Administration, and there can be no doubt of the understanding by both parties that, xxpon the same basis as had prevailed theretofore, the price of the bacon for January, February, and Mtp'ch deliveries would be cost with the addition of the profit allówed under the regulations of the Food Administration.
There is yet another contention for consideration, and it may best be stated by quoting from defendant’s brief, wherein it is said: ,
“After the transmission of the telegram of December 1C, 1918, from the War Department to the Depot Quartermaster at Chicago, and for the months of January and February, 1919, supplies were only purchased after the issuance of circulars of proposal sent out to prospective contractors for various kinds of bacon issue, and inviting the submission of bids on or before a given date. In case a bid was accepted, the awai'd or contract was made and contract entered into in accordance, with section 3744 Rev. Stat., paragraph 6895 Comp. Stat., the act of June 2, 1862, c. 93, 12 Stat. 411, and acts amendatory thereof and supplemental thereto, signed by the duly authorized contracting officers for both parties at the end thereof, and the same were duly approved by the Board of Contract Review. No circulars were distributed, awards made, purchase orders issued or contracts entered into for bacon to be delivered in the month of March, 1919.”
The telegram referred to, and reference is made to it else-wherc in the brief, is apparent^ treated as requiring thereafter that supplies be purchased upon submission of competitive bids, formal contracts, etc., a procedure which it is said was followed as to the bacon for January and February deliveries, but not as to March. The contention tends strongly to raise a question as to counsel’s sincerity, but we prefer rather to treat the matter as a misapprehension of the situation.
This telegram as to the identity of which there can be no mistake since it is referred to not only bjr date but by record page, is set out in Finding XXII. It was to General Knis-kern and the signature was “Wood,” acting quartermaster general and director of purchase and storage, and “ Baker,” chief of the subsistence division. The meaning, in the light *429 of all tlie attendant circumstances, seems too clear to justify discussion. But the question is raised.
The fact is found that after the armistice the Food Administration began to “ taper off,” (quoted from a witness) for the purpose of discontinuing its activities as soon as possible and that it made no further allotments of meat products and fixed no prices after those for December, 1918. We have discussed the purpose and effect of allotments and it appears that the Food Administration had made allotments for January, February, and March, 1919. It had fixed prices for September, October, November, and December, 1918. Previous thereto prices had been determined as already described. The time was near for the fixing of infices for January, the Food Administration was going out of business, it was therefore necessary that the Army should proceed independent^ of that organization, .and, very significantly, General Kniskern was authorized to proceed accordingly. What duty could devolve on General Kniskern that had been previously discharged by the Food Administration? What had been its functions? To make allotments, which it had made for January, February, and March and which had not been revoked, and to fix prices near the beginning of each month. This latter was its sole unexercised function as to these months. General Wood and the chief of the subsistence division were fully informed as to the procedure before this function was taken over by the Food Administration and, that body having abandoned this function, the telegram could have meant nothing else than that General Kniskern ivas authorized to proceed to fix prices as theretofore. This ivas the interpretation put upon it and this is what General Kniskern did.
Reference is made to the sending out of circulars of proposal inviting the submission of bids for January and February. We have already discussed the use of these proposal ' forms as a part of the adopted procedure for the fixing of. prices, a use based on convenience and contemplated to be for the purpose only of procuring the submission of the proposed prices on products already allotted and not for the purpose of procuring competitive bids and their use for January and February was no different. Bearing in mind *430 the nature of the product and the time necessary for jts preparation, the unreasonableness of a theory that supplies for January and February were being procured by bid, acceptance and formal contract is apparent.
■ The statement quoted omits mention of the usual purchase orders which were issued just as they had been theretofore, except that the purchase order for January was in some way defective, and was corrected by one of later date, and served the same purpose as they had theretofore when there were no formal contracts. Why someone concluded to prepare formal contracts thereafter can only be surmised. They were in effect retroactive or possibly nuno pro tunc. The contracts for January bore date February 10, and did not receive the approval of the Board of Contract Review, urged as absolutely essential, until February 26, although all deliveries had been completed February 11. The formal contract for February recites that it is made “ as of the fourth day of February, 1919, ” the date upon which a purchase order was issued, but, it did not receive the approval of the Board of Contract Review until March 1.
We are constantly mindful of the fact, as stated before, that January and February deliveries are not involved in this suit, but it has seemed necessary to review the whole situation to get the correct view of this contract and the procedure thereunder and particularly of that part thereof relating to March deliveries. It should perhaps be added that the reason why no blank proposals were sent out soliciting price on March deliveries, no price was proposed, and no purchase orders issued is obvious. The action taken as indicated by the letter of February 5,1919 (Finding XIX), interrupted this usual course of procedure and left the situation as one for future adjustment as the rights of the parties should be determined. Naturally if otherwise necessary, which is not conceded, there was thereafter no formal contract covering contemplated supplies for March, such as those subsequent contracts referred to in Finding XXII as to January and February deliveries. The rights of the parties were to be determined under the existing contract, if there was one, and if there was, none other was necessary.
*431 The lengthy consideration given the circumstances of this case and the law apparently applicable thereto has served but to strengthen the conclusion reached that upon me theory presented there was a valid contract between the plaintiff and the United States covering the subject matter of this action.
There are other theories upon which plaintiff asserts a right of action but, having reached the conclusion stated above, we shall not regard it necessary to discuss them in detail.
There is the theory, possibly not without merit, that this was an emergency contract within section 3709 K.. S., and hence not -within the provision of section 3744. That there was an emergency can hardly be questioned. The order of the Secretary of War so declared, it was a matter of common knowledge and common sense, and the definitions and declarations of the Supreme Court are conclusive. Am. Smelting & Refning Co., supra. Emergencies, it is said, can not be measured, and “immediate” applied to delivery does not necessarily mean a day or a week but is to be defined in its relation to the circumstances and the nature of the article. And it is difficult to find application for the language of the last half of the section if it does not set up a rule for itself, without the restrictions of and unaffected by 3744. But on the other hand this section has sometimes been held to relieve only from the necessity of advertising. If we had not reached the conclusion already stated on another theory of this case we must necessarily determine the scope and effect of 3709. As it is, we need not decide the question.
Plaintiff also asserts a cause of action in two different phases under the Dent Act.- The first theory is that out of these various conferences between General Kniskern and Major Skiles, on the one hand, and the representatives of the seven big packers, upon whom dependence for necessary supplies of bacon and canned meats must necessarily be placed, on the other, there arose a contract for capacity production under which the packers agreed to produce bacon to capacity and the United States agreed to take their entire production.
*432 There is considerable testimony in tlie record, and undisputed in fact, sustaining the contention that there was such an agreement. To the officers charged with the duty of procuring adequate supplies, in the face of the enormous and constantly increasing demand, the problem was to get enough, they! were urging increased production, and unquestionably represented that they would take all the packers could produce. And yet their conduct of affairs seems to negative the idea that they were proceeding under such a contract.
Had they been so doing it would seem that there would have been nothing to do but for the packers to produce to capacity and the Government to take that production be it more or less, and cover it with its purchase orders. But while for much of the time they did take and were no doubt glad to get all that was produced, they constantly adhered to the practice of receiving proposals from each packer and issuing authorizations of acceptances indicating the amount they were to furnish for each period involved. We can not conclude that they were proceeding under a contract for capacity production.
The second count on the theory of an action under the Dent Act declares upon the statements made to the packers by General Kniskern at the conference of November 9, 1918, with the averment that immediately thereafter, because thereof, and pursuant to the capacity production agreement, the packers, plaintiff included, commenced production of bacon of the required specifications and made expenditures and incurred obligations in that behalf before November 12, 1918.
No doubt at the time of and immediately following this conference and before November 12 the plaintiff was putting up Army bacon, and, continuing the purchase of hogs when the needs for January, February, and March were made known, it is shown that on November 10 they purchased hogs from which; bacon was made for January delivery, but it would be wholly inconsistent with our view of this case and with the facts as we see them to hold that they then' and before November 12 made any attempt or had an intention of entering into a contract which might by any possibility *433 be within the purview of the Dent Act. Some things said above with reference to the first Dent Act theory are applicable here. ■
Claim was presented upon this theory to the War Department Board of Contract Adjustment and, while the claim upon its merits seemed to appeal favorably to the Board, it was disallowed on the ground that no agreement had been made with the plaintiff prior to November 12, a conclusion which ivas affirmed by the Secretary of War on appeal and which we regard as correct.
The other theory is that the allotment made by the Food Administration was a compulsory order, in effect a commandeering, in connection with which stress is laid on the letter of the President set out in Finding XIV, the circumstances attending its writing being also set out in response to a request of the defendant. We have already indicated our views as to the authority of the Food Administration and the effect of an allotment, and in our opinion the contention of the plaintiff in this respect is not well founded. Further, attention may be called to the fact that the copy of the allotment sent to the plaintiff called for an acceptance. “ No acceptance was necessary if the order was a compulsory requisition.” Am. Smelting & Refining Co., supra.
. The defendant, in addition to vigorously contesting the claims of the plaintiff, has filed a counterclaim based on the transactions between the plaintiff and the defendant in the furnishing of bacon during the six months from September, 1918, to February, 1919, both inclusive.
The alleged indebtedness of the plaintiff to the defendant is $1,511,882, consisting of “ certain improper and illegal charges presented by the plaintiff to the defendant on account of Army bacon, delivered from September, 1918, to February, 1919, both inclusive, which charges were, by mistake, paid by the defendant to the plaintiff in the settlement of the bills and accounts so presented,” followed by a statement in detail as to each of the six months in which is included alleged overvaluation of green bellies, overcharge for shrinkage, and improper inclusion of items in the nature of overhead, in determining cost.
*434 The fact that nothing of illegality in the contracts for these six months is urged attracts attention, in view of vigorous contentions in opposition to plaintiff’s asserted rights, and we are not informed why this is so. The adoption of the theory above, suggested as to the effect of performance would furnish a plausible explanation. And why the line should be drawn between August and September, 1918, and no claim asserted on account of transactions on the same basis back of September is not apparent.
While we have, of course, given careful consideration to the evidence as well as the arguments in support of the counterclaim it has seemed not only an extended but an unnecessary ‘task to attempt to cover the transactions of these six months by detailed findings and we have stated the ultimate facts as we see them.
The cost of green bellies has necessarily figured as the basis item in the cost of producing bacon during all these transactions and it is plainly apparent, not only from the record in this case but as a matter of common sense, that it is impossible to determine to a mathematical accuracy just how much a slab of bacon belly cost a packer who bought the whole hog. • The plaintiff, by tests and by the application of reasonable processes of elimination has furnished’ a basis apparently fair. It is met to a very considerable extent by theories, none of which are any better founded, and some of which emanate from those who are pure theorists without practical experience. This is wholly true as to the charge for shrinkage, for the claim in that respect is predicated on the deductions of expert accountants. The whole claim is based upon a theory of mistake on the part of those whose duty it was to guard the interests of the Government and yet, with these men available and in fact on the Avitness stand, we do not find them supporting a theory that they were in any manner imposed upon in these transactions. There is in our judgment an absence of any showing which, would justify the opening up of these closed transactions and a charging back against the plaintiff.
In this connection we think it right and but a matter of common justice to call attention to the fact that while in the counterclaim itself the averment is that there was a “mis *435 take,” presumably on the part of Government officers, in the payment of these alleged overcharges, there are many statements in defendant’s brief which far transcend this theory and cast serious reflection on the conduct of the plaintiff. These we believe to be unjustified and feel that it is but due the plaintiff we should say so.
It is rare, indeed, that we have before us records exemplifying transactions of such extent and importance wherein the willingness of contractors to cooperate with representatives of the Government is so constantly manifest. It was plainly their right to be compensated on the basis of full reimbursement of all cost of production with a profit added, which had been fixed by governmental authority. And when they agreed to furnish bacon at a price to be determined, and on a basis which precluded their fixing it except it meet the approval, of General Kniskern, who was certainly at all times honestly and faithfully looking after the interests of the Government, they were certainly showing a proper spirit of cooperation. The practicing of deliberate deception in the matter of costs could furnish the only basis of criticism, and we find no foundation in the record for such a charge.
The big packers were the source of supply upon which reliance must be had. To them the appeal was made to meet the demand and the results ansAver for them as to their conduct. Army officers representing the GoA^ernment and writing business letters to contractors rarely feel called upon to depart from the path of business and inject a personal note of appreciation, but when this great strain was over and General Kniskern realized that he had successfully met such an emergency as. had never before presented itself, he added to his letter of January 25, 1919, to the plaintiff, this paragraph :
“Please accept the sincere thanks of this office for the hearty and loyal cooperation your firm has so generously gKen in the past, without which the difficulties of securing sufficient meat foods for the Army Avould haAre been well-nigh unsurmountable.”
We can not but observe, in concluding our discussion of this case on its merits, aside from necessary results, that, viewing this Avhole situation as it existed for considerably *436 more tlian a year, during which urgent needs demanded departure from established peace-time regulations, and during which, to meet those needs, faithful and efficient officers devised methods and those able to supply the needs cooperated willingly in making effective those methods, and during which those needs were met and the necessary supplies promptly furnished from' month to month, followed by acceptance and payment without objection, so far as appears, by anjr one to the method pursued, it would be passing-strange, an inexplicable injustice, if bAr reason of the invoking. of technicalities, making their appearance for the first time in this lawsuit, the plaintiff was to be left without any remedy as to supplies prepared for delivery under exactly the same conditions as had prevailed theretofore.
Tt remains to address ourselves to the measure of damages and some minor matters related thereto and so connected therewith that they may best be presented in that connection.
We have determined that the cost to the plaintiff of the ■serial No. 10 bacon put up for March delivery was $48.07 per hundred pounds. To this we conclude that there should be added a profit of 2y2 per cent provided for under the regulations of the Food Administration applicable to licensed packers. The cost to the plaintiff with this 2% per cent of profit added becomes in fact the contract price since it was agreed that the price, not stated in the writings, but reserved for future determination, should be the cost to the plaintiff Avith the stated percentage of profit added, and the uncertain element, that of cost, has been determined by our findings.
The plaintiff is, therefore, in stating an account, to be credited, as to the 3,328,776 pounds of bacon put up by Swift & Co. with that amount at $48.07 per hundred pounds, viz, $1,600,142.62, to Avhich is to be added 2y2 per cent thereof, Adz, $40,003.56, making a total of $1,640,146.18.
There Avas put up in the plant of Squire & Co., at Boston, for the account of Swift & Co., 868,896 pounds of serial No. 10 bacon, and it is stated in a separate item, first, because of the contention that Swift & Co. has no valid claim on account thereof, and, second, because of a slight difference in applicable price.
*437 The facts with reference to the status of Squire & Co. and the operation of that company in the production of a part of this bacon for Swift & Co. are to be found in Findings II and XXI, and we do not deem it necessary to discuss them here. We have no doubt that the bacon produced in the Squire plant is properly for inclusion herein to the credit of Swift & Co., the only difference arising from the fact that in all prices quoted and accepted or otherwise fixed or agreed upon, the price for Boston delivery was 50 cents per hundred (sometimes 70 cents) more than for Chicago delivery, a freight differential and an item properly to be computed as a cost item and resulting in a cost price of $48.57 for Boston delivery as against $48.07 for Chicago delivery. This price with the 2y2 per cent of profit added becomes the price the plaintiff had agreed to pay Squire & Co., less one-half of 1 per cent as its retained part of the profit.
The plaintiff is therefore to be credited on account of the 868,896 pounds of bacon put up by Squire & Co. for its account with that amount at $48.57 per hundred pounds, amounting, with 2% per cent added thereto, to the sum of $432,573.34, which, added to the first ascertained credit, makes a total on account of all serial 10 bacon of $2,072,-719.52.
As against this gross amount the plaintiff must, of course, be charged with the net amount realized or the amount which should have been realized from the sale of the bacon, and on this feature of the case the defendant contends that the plaintiff did not minimize damages as it should, citing the fact that it did not immediately put the bacon on sale and that whereas there was in the months of April, May, June, and July a “rising market” there was thereafter a falling and that plaintiff began to dispose of this bacon on a falling market.
No doubt, but for one very material fact, the measure properly to be applied to this side of the account would be “market value,” but the material fact is that there was no market value in the true sense. This was not a commercial product, there was but one customer, and when that customer declined to take it there was no market except *438 as it might be created. This bacon was more expensive to manufacture than ordinary commercial bacon, and in some respects better, but it was a special product, not regarded by the consumer as desirable, and not in any sense comparable in the market to commercial bacon.
There was a rising hog market during the period, and for the reason chiefly as set out in Finding XXVIII, but its effect even upon the market for commercial bacon is not shown with any definiteness, and its effect, if any, upon army bacon is purely speculative.
It was the duty of the plaintiff, if it sought to lay a proper foundation for a charge against the Government, to sell to the best possible advantage, to minimize damages, but in determining whether it did its full duty in this respect, as we believe it did, all the circumstances are for consideration.
We have called attention to the fact that during these strenuous times the plaintiff always cooperated with the Government authorities and at all times complied willingly with requests as well as instructions. It had acquired a commendable habit of implicit obedience, and, after its contract was terminated, with no protest on its part, and an adjustment was in order, it relied still on the officers with whom it had so long cooperated and awaited instructions. Without repeating too much of detail, reference to the letter of General Kniskern set out in Finding XXVI indicates that it had as yet been undetermined whether the Government would take the product in question and thus settle the matter, or allow the plaintiff to retain and dispose of it on a salvage basis, and in that letter advising sale plaintiff is officially informed of the price at which the Government was offering similar product for sale, an important circumstance in connection with the course adopted by the plaintiff to avoid cutting tinder and thus unfairly competing with the Government. The methods adopted by the plaintiff and its procedure thereunder are set out in Finding XXVIII, and we think need not be repeated. If we were to attempt to put on paper what the plaintiff should have done rather than what it did, the futility of the attempt, *439 as we see it, would furnish the strongest possible argument in support of the conclusion that the situation was handled as well as could be.
From the sale of the entire 4,197,672 pounds of serial No. 10 bacon the plaintiff realized gross, $1,062,847.54, with which.it is to be charged, less such expenses of sale as may be found to be properly deductible to arrive at the proper net proceeds.
In Finding XXIX are set out the items of expense claimed, followed by a brief explanatory note as to the several items. The allowance or otherwise of some of these items may not be so determined as to rid the conclusion of all possible doubt, but it is our view, well founded we think, that the third, fourth, and fifth items, viz, storage charges, insurance, and interest, must be eliminated,'and the allowance for expenses of sale limited to items one, two, and six, viz, transportation expenses, selling expenses, and miscellaneous, aggregating $62,791.73, which sum deducted from the gross proceeds of sales, $1,062,847.54, leaves as net proceeds $1,000,055.81 to be charged against the plaintiff which, deducted from the gross credit of $2,072,719.52,. leaves to plaintiff as a net credit on account of all serial No. 10 bacon, $1,072,663.71.
We have determined the cost to the plaintiff of the salt bellies which it was not permitted to put in smoke at $37.41 per hundred pounds. The 417,881 pounds at the Swift plant amounted at this figure to $156,329.28 and the 650,658 pounds at the Squire plant for which Swift & Co. was liable to Squire & Co., at the same figure, to $243,411.15, a total of $399,740.43.
The details as to the sale of these bellies are set out- in Finding XXX. It there appears that 65,225 pounds of these bellies were sold in the United States, for which $21,796.13 was realized, an average price of $33.41 per hundred. The conclusion that these were fairly good sales and for the best obtainable price is justified, without argument, and it follows that as to this quantity the-plaintiff is entitled to a credit for the cost to it of 65,225 pounds at $37.41 per hundred, $24,400.67, less $21,796.13 received from sales, viz, $2,604.54.
*440 The larger part of the salt bellies were shipped abroad and in Finding XXX is shown the dates and destinations of these shipments and, in a tabulation, the details of the sales made. This tabulation shows a rather disastrous result of this venture, particularly as to the sales in France where much the larger part of this product was sent. -
This situation seems rather to require for what, if anything, it may be worth, a matter of justice if nothing more, the statement that to us it seems quite clear that in seeking a foreign market for this product plaintiff was acting in perfect good faith and in accordance with its best judgment, based on former experiences in exporting and information then at hand as to markets to be anticipated abroad. It shipped with this product other products of its own on which it suffered heavy losses.
But we are of the opinion that its good faith in this respect, the fact that it exercised its best judgment, can not relieve it from the consequences of its error in seeking a foreign market. It is true that it does not appear that it could have made other sales on the basis of those made in New York; on the contrary it is rather to be implied that other purchasers were not then available and that the one found would not buy further, but it seems to us that it was the dxity of the plaintiff to have relied upon the home market and to have taken such steps that it might show that it had exhausted that market before resort to a foreign one, and that, in the absence of such a showing, it assumed the risk of procuring such results as would demonstrate that the course taken had resulted beneficially to the other party.
Under the circumstances we can not conclude that the plaintiff is entitled to measure its recovery against the United States by the results of these foreign sales, and if not so entitled, it has furnished us no other standard and must therefore, in this respect, be precluded from recovery.
The question raised as to the overcuring of these bellies and its results is eliminated from necessary discussion by the conclusion just stated.
To the' amounts already- determined in favor of the plaintiff, viz, $1,072,663.71 on account of serial 10 bacon, *441 and $2,604.54 on account of 65,225 pounds of salt bellies, there is to be added $2,118.05 on account of the difference between the cost price of certain materials and their salvage value (Finding XXXII), making a total of $1,077,386.30, for which we have awarded judgment.
Geaham, Judge; Hat, Jxidge; Booth, Judge, and Campbell, Chief Justice, concur.